CITY OF CHANUTE, KANSAS; City of Auburn, Kansas; City of Cleveland, Oklahoma; City of Garnett, Kansas; City of Humboldt, Kansas; City of Iola, Kansas; City of Neodesha, Kansas; and City of Osage, Kansas, Plaintiffs,

v.

WILLIAMS NATURAL GAS COMPANY, Defendant.

No. 87–1463–K.

United States District Court, D. Kansas.

Feb. 5, 1988.

On Motion to Modify Feb. 9, 1988.

---

Wheatley & Wollesen, Annapolis, Md., Stumbo, Stumbo, Hanson & Hendricks, Topeka, Kan., for plaintiffs.

Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, Okl., Adams, Jones, Robinson and Malone, Wichita, Kan., B.E. Potts, Gen. Counsel, Williams Natural Gas Co., Tulsa, Okl., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

Plaintiffs, Cities of Chanute, Auburn, Garnett, Humboldt, Iola, Neodesha, and Osage City, Kansas, and Cleveland, Oklahoma ("Cities"), seek an injunction compelling defendant Williams Natural Gas Company ("Williams" or "WNG") to permanently open access to its interstate natural gas pipeline which is connected to each of the plaintiff Cities. The Cities allege Williams' failure to open access to its pipeline to alternate suppliers of natural gas constitutes an intentional monopoly in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

This action was filed on August 3, 1987, and on August 7, 1987 a hearing was held before the Honorable Frank G. Theis on plaintiffs' motion for a temporary restraining order. In a ruling from the bench, Judge Theis denied the plaintiffs' motion. The Cities subsequently filed the motion for preliminary injunction now pending before this court.

A hearing on the preliminary injunction motion was held on October 20–23, 27–28 and November 16–19, 1987 (hereafter referred to as "hearing"). After the hearing, the parties submitted extensive briefs detailing their proposed findings of fact and conclusions of law. Final oral argument on the motion was held January 25, 1988, at which time the court announced that it would grant the requested injunction. However, the court stated the injunction would not take effect until it issued a full written memorandum and order. Accordingly, the court is now prepared to make written findings and conclusions on the plaintiffs' motion for a preliminary injunction.

### Factual Background

Plaintiff Cities are each municipalities with their own natural gas distribution systems. The Cities purchase natural gas at wholesale and then resell it to residential, commercial and industrial customers within the Cities and surrounding areas.

Defendant Williams Natural Gas is a Delaware corporation with its principal place of business in Tulsa, Oklahoma. Williams is engaged in the business of interstate sale and transportation of natural gas, and as such is regulated by the Federal Energy Regulatory Commission ("FERC" or "the Commission"). Williams obtains gas from producing fields in various states, transmits the gas to its service areas, and delivers it to customers in Kansas, Oklahoma, Missouri and Nebraska. Williams' customers are primarily of two types: (1) local distribution companies ("LDCs"), such as the plaintiff Cities, which purchase gas from WNG at a "margin" or "markup", and resell the gas to the ultimate consumers; and (2) industrial gas users which purchase gas directly from WNG.

Each of the plaintiff Cities in this action can be characterized as an "LDC" and has or has had a "full requirements" contract with WNG. Under such contracts, the Cities must purchase all of their gas requirements from WNG, and WNG must maintain sufficient gas reserves to meet those requirements. For purposes of this case, there are essentially two types of rates and services available to the Cities

under "full requirements" contracts: firm service (F–2 rates—$3.16 and $3.26/mcf), which is primarily for residential customers; and large industrial service (I–2 rates —$2.75/mcf). Under either service, the gas is purchased by the Cities for resale to residential and industrial users.

In addition to these full requirements contracts, all of the Cities, except Auburn and Cleveland, have direct sale contracts with WNG to purchase gas for delivery to and use by the Cities in their municipal electric power plants. These contracts are known as "interruptible service" contracts and differ substantially from "full requirements" contracts. Interruptible service is provided on a "when available" basis, and accordingly, may be interrupted during periods when demand for gas is greatest. Further, either party can terminate such contracts upon 30 days' notice.

With the exception of the cities of Cleveland and Garnett, all of the plaintiff Cities currently have "full requirements" contracts in place with WNG, and the parties continue to operate under those contracts. Cleveland and Garnett's contracts with WNG expired by their own terms in May of 1987.[1] However, those two cities continue to purchase natural gas from WNG under the full requirements resale service provided under WNG's FERC certificate and tariff.

WNG's pipeline is the only major interstate pipeline serving plaintiff Cities, and prior to December, 1986, other natural gas suppliers did not have access to Williams' pipeline. However, prompted by the FERC's issuance of Order No. 436 (see discussion at pp. 12–14), WNG opened its pipeline to transportation gas on an interim basis on December 22, 1986. Under this "open-access" system, the Cities had an opportunity to purchase natural gas from third parties (e.g., other producers and marketing companies) and have that gas transported over WNG's pipeline. In return for transporting the gas, Williams received a fee called a "transportation rate".

In order that the Cities could purchase gas from other sources, FERC temporarily waived its certificate and tariff provisions and Williams temporarily waived its "full requirements" contract provisions with the Cities.

Thus, while the "full requirements" provisions were waived, WNG's customers (including the plaintiff Cities) were free to replace all or any part of the gas they normally purchased from WNG with third party gas.

By April of 1987, WNG's customers were purchasing from third parties large volumes of gas previously purchased from WNG. WNG's vice president of marketing and supply, Jack Finch, testified at the hearing that by July of 1987, 80% of WNG's sales of system supply gas had been converted to transportation. Finch further testified that as a result of the reduced sales, WNG's "take-or-pay" exposure increased dramatically during the period of open access. (Note: "take-or-pay" contracts between pipelines and producers commonly require a pipeline to pay for a specified percentage of delivered gas whether or not it is in fact taken).

Despite increasing take-or-pay exposure, WNG was able to keep the pipeline open until August 1, 1987, by negotiating with its producers (primarily Amoco Oil Company) for take-or-pay relief.

During the period of interim open access, each of the plaintiff Cities obtained gas from Vesta Energy Company ("Vesta"), a marketing company engaged in the sale at the wellhead of natural gas supplies. Some of the Cities contracted directly with Vesta while others contracted with a consultant, Leo Edison, who, in turn, contracted with Vesta. The contracts were of varying terms and duration but can be generally categorized as follows:

Cleveland

On December 9, 1986, the City of Cleveland, Oklahoma entered into a "natural gas sale agreement" with Leo Edison, whereby the City agreed to purchase gas from Edi-

---

1. Williams' firm service contracts with Chanute, Humboldt and Neodesha will expire on April 22, 1988. The Osage City contract expires Au-gust 22, 1989, while Iola's contract expires December 22, 1989. Auburn's contract is the last to expire, on December 22, 1990.

son for a period of five years at a specified price of $2.17/mcf, and thereafter at $.50/mcf less than the price of WNG's gas. Pursuant to a written transportation agreement, WNG commenced transportation of that third party gas to the City of Cleveland in February, 1987.

Auburn, Humboldt, Iola and Osage City

The Cities of Auburn, Humboldt, Iola and Osage City also commenced the purchase of third party transport gas in June and July of 1987 under gas purchase agreements with Leo Edison. These agreements were of short-term duration ending in September or October of 1987, or were month-to-month arrangements which could be cancelled by either party on 30 days' notice. The gas purchased by these Cities was transported by WNG under written transportation agreements with each City.

The source of supply for Edison's contracts with the City of Cleveland, as well as with the Cities of Auburn, Humboldt, Iola and Osage City, was a five-year contract between Edison and Vesta. The contract provided for a base price of $1.50/mcf at the delivery point, to be adjusted every six months based on 70% of the increase or decrease in WNG's average resale price to its customers.

Neodesha, Garnett and Chanute

The Cities of Neodesha, Garnett and Chanute also commenced transportation under WNG's interim open-access program in June, 1987, pursuant to written transportation agreements with WNG and direct sale agreements with Vesta. The City of Chanute purchased gas from Vesta under a month-to-month arrangement while the City of Neodesha purchased gas from Vesta under an agreement covering the months of June and July, 1987 (Pltfs' Ex. 5). The City of Garnett's agreement with Vesta covered only the month of June, 1987. While none of these three cities actually entered into a long-term contract with Vesta, the evidence at the hearing showed that negotiations for a long-term arrangement had been completed between these cities and Vesta when WNG announced the closing of its pipeline effective August 1, 1987. Vesta's vice president of

gas sales, David Tudor, testified that except for the starting price, the terms of the long-term agreement contemplated by these three cities and Vesta were identical to the terms of the Vesta/Edison agreement. Tudor further testified that the contracts were not formalized because of uncertainty as to how long WNG would keep its pipeline open.

To summarize, at the time WNG closed its pipeline, the City of Cleveland, Oklahoma, and the Cities of Auburn, Humboldt, Iola and Osage City, Kansas, had available a long-term, low-cost supply of Vesta gas. While the Cities of Garnett, Neodesha and Chanute had no long-term contract in effect with either Vesta or Edison, the essential terms of such a contract had been agreed upon.

When WNG closed its pipeline on August 1, 1987, the Cities were again required to purchase gas from Williams at a price substantially higher than the price of gas available to them through Vesta. The Cities subsequently filed the instant action, alleging WNG's refusal to open the pipeline constitutes monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and seeking an injunction ordering WNG to open access to its pipeline to the plaintiff Cities.

*Economic and Regulatory Environment*

It is clear to the court that any analysis of this case must take into account the economic and regulatory environment in which the parties were operating. Accordingly, prior to discussing the elements required to issue a preliminary injunction, and whether plaintiffs have met those elements, the court first briefly summarizes relevant regulatory actions and their impact upon the natural gas industry, with particular emphasis on their effect upon the parties to this action.

Since the enactment of the Natural Gas Act of 1938, 15 U.S.C. § 717 *et seq.*, the natural gas industry has undergone substantial and complicated changes. Yet the fundamental goal of the NGA is still intact—that being to protect consumers from exploitation at the hands of natural gas

companies. *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944); *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d 981, 995 (D.C.Cir. 1987). Under the NGA, the Federal Power Commission (the predecessor to FERC) set price ceilings for sales from producers to pipelines and also regulated the prices pipelines could charge to their downstream customers. *Transcontinental Pipe Line v. Oil & Gas Bd.*, 474 U.S. 409, 420, 106 S.Ct. 709, 715–16, 88 L.Ed.2d 732 (1986). However, the price of interstate gas at the wellhead was fixed well below market and a discrepancy developed between the price for interstate gas and unregulated intrastate gas, and gas production was withheld from the interstate market. *Maryland People's Counsel v. F.E.R.C.*, 761 F.2d 768, 770 (D.C.Cir.1985).

By the early 1970s, a serious gas shortage had developed, apparently caused in part by an imbalance between supply and demand brought on by the NGA's artificial pricing scheme. Thus, in 1978, Congress enacted "a new system of natural gas pricing" under the Natural Gas Policy Act ("NGPA"), 15 U.S.C. § 3301 *et seq. Transcontinental Pipe Line v. Oil & Gas Bd.*, 474 U.S. at 421, 106 S.Ct. at 716.

In the NGPA, Congress substantially terminated the Commission's wellhead price regulation by defining eight categories of natural gas production and setting ceiling prices for "first sales" in each category. 15 U.S.C. §§ 3311–33.[2]

The effect of the NGPA on producers, as compared to interstate pipelines, has been summarized by FERC as follows:

As a direct result of the NGPA, ... a natural gas producer can now sell "new" gas to any purchaser—an intrastate pipeline, an interstate pipeline, a local distribution company served by an intra- or interstate pipeline, an end user, a nonprofit consumer cooperative or what have you—without federal restrictions as to market entry, market exit or price attaching to the sale. Similarly, an independent marketer can acquire a portfolio of gas purchase agreements and sell gas supply to any person, again without coming under any market entry, market exit or price regulation over the sale. In short, with respect to sales of the commodity by producers or marketers, Congress removed controls in recognition of the competitive nature of the commodity market for gas.

An interstate pipeline, however, seeking to sell gas from its system supply (a commingled stream of gas that was at the wellhead both NGA-jurisdictional and NGA-nonjurisdictional) is subject to the full panoply of statutory regulation governing market entry, market exit and price....

The rationale for maintaining utility-type market entry, exit, and price regulation over the sales for resale of interstate pipelines while removing that regulation for similar sales by other market entities is only implicit in the NGPA but appears plain enough: While Congress concluded that gas production was sufficiently competitive to remove regulation, the control which interstate pipelines exercised over transportation still conferred on them the same kind of market power over their customers as had existed at the time of enactment of the NGA.

Order No. 436, 50 Fed.Reg. 42,408, 42,418 (1985) (footnotes omitted).

Thus, interstate pipelines, like WNG, are still subject to pervasive regulation by FERC. For instance, pipelines must secure a certificate of convenience and necessity prior to performing any significant act— e.g., construction of new facilities or initiation of new transportation service or new sales for resale. 15 U.S.C. § 717f(c). Pipelines also must obtain commission approval when they abandon any "certificated" facility, transportation or sale. 15 U.S.C.

---

**2.** The NGPA provided for the almost immediate deregulation of certain "high cost" gas, while for most "new gas" it established new ceilings and provided for gradual increases until scheduled deregulation on January 1, 1985 or July 1, 1987. The NGPA did not deregulate "old" interstate gas, but instead provided for adjustment of the price ceilings for inflation and authorized the Commission to raise former ceilings to higher "just and reasonable" levels. *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d at 994.

§ 717f(b). Additionally, the commission limits to "just and reasonable" levels the prices at which the interstate pipelines sell gas for resale or provide transportation services. 15 U.S.C. § 717c(a).

During the natural gas shortage which occurred in the 1970s, pipelines were encouraged by the commission to develop supply reserves and enter into long-term contracts with producers. The long-term contracts commonly incorporated high prices (and provisions for escalation upward) as well as "take-or-pay" provisions, requiring pipelines to either take some specified percentage of the deliverable gas, or to make "prepayments" for that percentage anyway. *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d at 995–96, 1021.

It was during this period of time that Williams Natural Gas acquired extensive new gas reserves from Amoco Production Company in the Wamsutter and Moxa regions of Wyoming, most of which contained high NGPA incentive prices. WNG was able to add this high-priced gas to its system and still sell it at a competitive price by "rolling in" the cost of the high-priced Wyoming gas with the cost of inexpensive "old gas" (e.g., from the Hugoton field) to reach a relatively low weighted average cost of gas (WACOG).

However, by 1982 the combination of a number of factors (including energy conservation, mild winters and lower prices of competing fuels such as petroleum) resulted in falling gas prices and a natural gas surplus. Further, various economic factors raised the wellhead price of gas. Producers of gas, responding to high prices and high take-or-pay terms, continued to develop new supply sources of gas. But since gas demand had fallen off, and the market could not absorb supplies at prevailing prices, a surplus of gas deliverability resulted. Thus, producers sought open access to pipeline transportation as an alternative to pipeline sales for marketing their gas. Moreover, purchasers of natural gas sought to purchase gas directly from the producer and have it transported in competition with the system supplies the pipeline retained under uneconomic long-term contracts. Finally, interstate pipelines, seeking new markets and lower prices for both surplus gas supplies and surplus pipeline capacity, expressed reluctance to provide transportation services to other suppliers, particularly where transportation of gas would displace the pipeline's own sales volumes, subjecting the pipeline to substantial take-or-pay exposure.

### Order No. 436

In response to these conditions, FERC promulgated Order No. 436, 50 Fed.Reg. 42,408 (1985), (codified at various sections of C.F.R.). This order was motivated by the Commission's determination that the pipelines' refusal to transport gas for third parties had caused serious market distortions.

The essence of Order No. 436 is "a tendency, in the industry metaphor, to 'unbundle' the pipelines' transportation and merchant roles." *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d at 994. While Order No. 436 is a highly complex order, it basically imposes open access commitment on any pipeline that (1) secures a "blanket certificate" to provide gas transportation pursuant to § 7 of the NGA, 15 U.S.C. § 717f, or (2) actually provides transportation under § 311 of the NGPA, 15 U.S.C. § 3371. It further provides that if a pipeline holds itself out as a transporter of gas for others, the pipeline's LDC customers then have an opportunity to convert their existing contract demand ("CD") from an obligation to purchase gas to an obligation to use (or pay for) transportation services.

In *Associated Gas Distributors v. F.E. R.C.*, 824 F.2d 981, the District of Columbia Circuit Court of Appeals upheld the substance of Order No. 436, but recognized that FERC had failed to deal with the problem of uneconomic take-or-pay contracts between pipelines and producers. Accordingly, the court remanded Order No. 436 to the Commission with the directive to determine to what extent certain policy considerations may justify the Commission's inaction on the uneconomical producer-pipeline contracts. 824 F.2d at 1030.

As has already been discussed, WNG commenced interim open access on December 23, 1986, in response to FERC's issuance of Order No. 436. By July, 1986, WNG had filed with FERC an Order 436 "Stipulation and Agreement" which detailed Williams' plans for a permanent open-access program. FERC approved Williams' stipulation and agreement on February 20, 1987, subject to substantial modifications and conditions. Williams found these conditions unacceptable, however, and began revising its stipulation and agreement. In October of 1987, a revised stipulation and agreement was distributed to WNG's customers and submitted for Commission approval. At this time, the Commission has still not approved WNG's permanent open-access proposals, and WNG is no longer operating under the interim open-access program.

### Order No. 451

On June 6, 1986, FERC issued Order No. 451, 51 Fed.Reg. 22,168 (1986). Order No. 451 established procedures for the renegotiation of low, old, pre-NGPA gas prices and the release of gas covered by such pre-NGPA gas purchase contracts. 18 C.F.R. § 270.201 (1987).[3]

The commission issued Order No. 451 in an attempt to revise its methodology of regulating producer sales of "old gas" in response to changes in market conditions. The commission also recognized that the existing rate structure for old flowing gas had created at least three problems for natural gas consumers:

First, the existing rates for most old gas are below the replacement cost of gas reserves.... Most producers of old gas are not receiving revenues equivalent to the marginal costs of replacing depleted old gas reserves, and gas reserves are being consumed faster than they are being replaced....

Second, the existing rates for old, flowing gas vary widely by vintage, based on the date of its dedication to interstate commerce. The overall prices consumers pay for gas depend directly on the access of their pipeline suppliers to these cheaper vintages of gas. Therefore, wide variations in pipeline access to old gas have created huge disparities in the prices consumers pay for gas at the burner-tip around the country....

Third, the pricing of old, flowing gas below replacement cost gives pipelines with large "cushions" of such gas the ability to "roll-in" their prices of new and deregulated gas with artificially low old gas prices. This allows the pipelines to effectively subsidize the prices of new and deregulated gas above what consumers would otherwise be willing to pay, and therefore frustrates the efficient working of competitive wellhead markets.

51 Fed.Reg. at 22,172.

Order No. 451 establishes a single alternative ceiling price for categories of "old gas" committed or dedicated to interstate commerce before enactment of the NGPA, and eliminates the various ceiling prices for different "vintages" of old gas previously set according to when the gas reserves were produced.

However, before a producer may collect a higher price for its old gas under an existing contract, it must first enter into what is known as a "good faith negotiation" ("GFN") process with the purchaser. Under the GFN process, a producer is permitted to abandon a contract only if the producer first seeks a higher price for its old gas, is unable to agree with the purchaser on a suitable price, and finds another purchaser. 18 C.F.R. § 270.201(b) & (c) (1987). Further, if a tentative new purchaser is not a firm sales customer of the existing purchaser, and the existing purchaser is not an open-access transporter under Order No. 436, firm sales customers of the existing purchaser have a right of first refusal. 18 C.F.R. § 270.201(g) (1987). Finally, interstate pipelines that are not open access transporters under the provisions of Order No. 436 will be granted blanket transportation certificates and will

---

**3.** A case seeking review of Order No. 451 is currently pending before the Fifth Circuit Court of Appeals. *See Mobil Oil Exploration Co. v. F.E.R.C.*, Case No. 86–4940.

be deemed to have agreed to deliver on behalf of any shipper any gas released under this rule to any of its existing customers or interconnected pipelines. 18 C.F. R. § 270.201(h) (1987). Thus, while pipelines will not become open-access transporters by virtue of such transportation, they may be obligated to transport gas to their own customers under certain conditions.

As for the instant case, testimony at hearing indicated that several producers have entered into or completed the GFN process with WNG, and "451 gas" released pursuant to those negotiations has been made available to the Cities in at least three instances. Specifically, since June of 1987, Cabot Petroleum Corporation, Dakar Operating Company, and Mesa Petroleum have offered 451 gas to the Cities.

The Cities declined to accept the Cabot offer because it was for interruptible gas with prices and quantities to be renegotiable each month. The Dakar offer required the buyer to construct and maintain pipelines and meters at the wells located approximately 800 to 1,000 miles from Chanute. The Mesa proposal, which called for a price of $2.85/mcf, plus a transportation charge of $.52/mcf, was not acceptable to the Cities because it was "not competitive with Vesta." Finally, both Tenneco Oil Exploration & Production Company and Mobil Oil Corporation have entered into the Order No. 451 GFN process with WNG, but the process is not yet complete. Accordingly, the terms at which that gas will be offered to the Cities are not yet known.

### Order No. 500

In response to the remand of Order No. 436 by the Court of Appeals in *Associated Gas Distributors,* the Commission issued Order No. 500 on August 7, 1987. Order No. 500 basically provides a crediting mechanism whereby pipelines which transport gas for producers under Order No. 436 may receive a credit against their obligations to take a similar volume of gas under take-or-pay contracts with those same producers.

There are, however, some situations in which pipelines must transport gas without credits. The most obvious situation occurs when the pipeline does not have a take-or-pay contract with the producer who owned the gas being transported by the pipeline. In such a case, there could be no credits because there would be no qualifying take-or-pay contract against which to apply any credits.

A second situation in which a pipeline must transport a producer's gas without credits occurs when a pipeline transports gas which it previously purchased under a terminated take-or-pay contract, and which is not presently committed to the pipeline. For instance, if a producer-pipeline contract has been terminated under Order No. 451, no credits would be available to a pipeline which later transported the same producer's gas. However, for a contract to be considered terminated under Order No. 451, sales of all gas covered by that contract must have been abandoned or terminated under No. 451's GFN rule.

### Conclusions of Law

Before a preliminary injunction may be granted, four prerequisites must be satisfied by the moving party. The movant must establish: (1) a showing that the movant will suffer irreparable injury unless the injunction issues; (2) proof that the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) a showing that the injunction, if issued, would not be adverse to the public interest; and (4) a substantial likelihood that the movant will eventually prevail on the merits. *Amoco Oil Co. v. Rainbow Snow, Inc.,* 809 F.2d 656, 661 (10th Cir.1987); *City of Chanute v. Kansas Gas & Electric Co.,* 754 F.2d 310, 312 (10th Cir.1985). Where the first three requirements for a preliminary injunction are satisfied, the Tenth Circuit has lessened the moving party's burden of proof on the fourth requirement. The court has held: " '[I]f the other elements are present ... it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investiga-

tion.'" *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980), (*quoting Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 781–86 [10th Cir.1964]). The function of a preliminary injunction is to preserve the status quo pending the outcome of the case. *Tri–State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986). Thus, as a preliminary matter, the court must consider whether the grant of a preliminary injunction would preserve or upset the status quo.

Williams argues a preliminary injunction could only alter the status quo because Williams' pipeline is currently closed to transportation of third party gas and the plaintiffs seek to open the pipeline. The Cities point out, however, that Williams' pipeline was open until August 1, 1987, and the Cities, by filing the instant action, were only attempting to preserve the status quo as it existed prior to August 1, 1987. The court finds the Cities' argument persuasive, particularly in light of the fact the Cities filed this action on August 3, 1987, only two days after WNG had ceased open access.

Irreparable Harm

■ Perhaps the most important prerequisite for the issuance of a preliminary injunction is a showing that if the injunction is not granted, the movant will suffer "irreparable harm" before a decision on the merits can be rendered. 11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2948. A preliminary injunction will usually be denied if monetary damages are sufficient to compensate a plaintiff. *Tri–State Generation v. Shoshone River Power, Inc.*, 805 F.2d at 355; *Holly Sugar v. Goshen County Co-op. Beet Growers*, 725 F.2d 564, 570 (10th Cir.1984).

The question of whether the Cities have suffered "irreparable injury" must focus on the Cities' long-term contracts with Vesta. The Cities' contentions with respect to this issue are simple and persuasive. When Williams closed its pipeline on August 1, 1987, each of the plaintiff cities had available a dependable, long-term source of gas at a substantially lower cost than the gas supplied by Williams. The Cities argue when Williams closed its pipeline, it effectively terminated the Cities' arrangements for such gas, and this loss constituted "irreparable injury" to the Cities.

Williams contends, however, the loss of the Vesta contracts cannot form the basis for the Cities' claims of "irreparable injury" because (1) three of the plaintiff cities had no long-term contracts in place at the time WNG closed its pipeline; and (2) the Cities' contracts with Vesta were "suspended" rather than "terminated" by WNG's closing of the pipeline.

WNG apparently concedes that the Edison/Vesta contract was for a long-term supply of gas, and that this gas was "earmarked" for the cities of Auburn, Humboldt, Iola and Osage City, Kansas and Cleveland, Oklahoma. WNG focuses instead on the cities of Chanute, Garnett and Neodesha, and argues these cities had no long-term contracts in place on August 1, 1987, and thus could not be irreparably harmed.

However, testimony at hearing showed that these three cities (Chanute, Garnett and Neodesha) were in the process of negotiating long-term contracts directly with Vesta when WNG closed its pipeline. For instance, Vesta's "letter agreements" with these three cities for the sale of "spot gas" in June and July of 1987 specifically noted that Vesta would flow the short-term gas to the Cities while the long-term agreements were being finalized. Moreover, Vesta's representative, David Tudor, testified that Vesta "fully intended to offer and enter into" a long-term gas sales contract with the cities of Chanute, Neodesha and Garnett and the essential terms of the agreement had been finalized (e.g., a five-year contract for the sale of gas at the rate of $1.45/mcf, adjusted according to 70% of WNG's sales service charge). Tudor further stated that the agreement was not actually entered into because it was uncertain how long Williams would keep its pipeline open. Thus, it is clear that had Williams not closed its pipeline, each of the plaintiff Cities would now have a supply of long-term, low price gas available through Vesta.

Williams asserts, however, that even if the court finds that each of the Cities had a long-term source of supply available through Vesta, the Cities cannot show that such contracts were lost as a result of Williams closing its pipeline. WNG notes that the Edison/Vesta contract (which was the source of supply for five of the Cities) contained a "force majeure" provision which arguably "suspended" rather than "terminated" the contract in the event the gas could not be transported over WNG's line. Thus, Williams reasons that should it decide at some indefinite point in the future to open access to its pipeline, the Vesta contract will, in effect, "pick up where it left off." Accordingly, Williams argues the Cities have not suffered irreparable injury because the contracts have not been terminated, and any loss suffered by the Cities will be compensable in money damages.

This argument is not supported by the evidence. First, the contract provision in question provides:

14.1 The term "force majeure" as used in this Gas Purchase Contract shall mean Acts of God, strikes, lockouts or other industrial disturbances ... and causes of like or similar kind, whether herein enumerated or not, and not within the control of the party claiming suspension and which by the exercise of due diligence such party is unable to overcome.

14.3 It specifically is recognized and agreed by the parties hereto that the gas to be made available for sale and delivery by Seller which is purchased by Buyer hereunder may be transported by third party pipelines for Seller's account in order to effect delivery to Buyer at the delivery point(s). Accordingly, in addition to such other events of *force majeure* also shall exist when any third party pipeline is unable or otherwise declines to transport any volume of gas subject hereto during any period of time.

(Pltfs' Ex. 13, pp. 11–12.)

While it is clear that a pipeline's refusal to transport gas is a "force majeure" event

under the contract, it is not clear from the contract the effect such an event has upon the parties' obligations to perform. It is probable that a determination of this question would require an examination of the entire contract and the intent of the parties as well as a consideration of the indefinite duration of the "force majeure" event in this instance. In any event, that question is not before this court. What is properly before the court is the testimony of Vesta's vice president, David Tudor, who stated that when WNG closed its pipeline, the gas which would have been sold to the plaintiff cities was resold on the spot market and transported over an open-access pipeline. Moreover, Tudor testified that if Williams' pipeline were to open again six months to a year after this case is tried on the merits, Vesta might not be willing to enter into a long-term gas purchase agreement with the plaintiff cities.

Tudor's testimony supports two findings: (1) the Cities' contracts with Vesta were effectively terminated when WNG closed its pipeline; and (2) if an injunction is not granted in this case, the Cities may lose the opportunity to contract with Vesta for a long-term, dependable supply of low cost gas.

This determination raises a final question with respect to this issue, e.g., can the loss of the Vesta contracts constitute "irreparable injury"?

A similar situation was addressed by the Tenth Circuit Court of Appeals in *City of Chanute v. Kansas Gas & Electric Co.,* 754 F.2d 310, and a brief discussion of that case is helpful here.

In *City of Chanute*, the plaintiffs were three cities which generated electric power through their own operation and distribution systems, and also purchased wholesale electric power from defendant Kansas Gas and Electric Company (KG & E). A dispute arose between the parties when the plaintiff cities attempted to contract with additional suppliers of electricity [4] and thus

---

**4.** The Cities of Chanute and Iola contracted with the Southwestern Power Administration

(SWPA) and were to begin receiving five-year allocations of federally generated hydro-electric

approached KG & E (which maintained the only transmission lines into the plaintiff cities) to arrange for the "wheeling" (or transfer) of the power. While KG & E was willing to wheel power to the cities, it would do so only on the condition that the cities would enter into new, higher priced contracts with KG & E for the purchase of wholesale power. When the cities refused to accept these conditions, KG & E refused to wheel power to them. 754 F.2d at 311–12. Plaintiffs subsequently filed an action against KG & E alleging violations of §§ 1 and 2 of the Sherman Act and of § 3 of the Clayton Act.

The trial court granted plaintiffs' motion for a preliminary injunction requiring KG & E to wheel power to the cities pending the outcome of the suit, and in so doing found that all three cities would suffer irreparable harm if the injunction were not granted. *City of Chanute v. Kansas Gas and Elec. Co.*, 564 F.Supp. 1416 (D.Kan. 1983).

On appeal, the Tenth Circuit affirmed the district court's finding of irreparable harm as to the Cities of Chanute and Iola, but reversed that finding as to the City of Fredonia. The appeals court determined that because Chanute and Iola would lose their allotment of power without wheeling, they suffered irreparable damages. The court reasoned:

> The difference in energy cost incurred by Chanute and Iola with and without SWPA power may be ascertainable, at least for the immediate future. *The value of the availability of potential supplier, however, cannot always be measured in dollars, particularly when, as here, such availability changes the competitive structure of the market and the supplier may be necessary to meet the long-term electrical demands of the cities.*

754 F.2d at 313 (emphasis added).

However, the court in *City of Chanute* distinguished Fredonia's situation on the

ground that Fredonia's right to power from the Nearman Creek Project was not contingent on the issuance of the injunction. Rather, the court held that absent the injunction, the city "would merely be forced to pay for power it did not receive. This injury can be measured and compensated in dollars." 754 F.2d at 313.

The position of the plaintiff Cities in the instant case can be likened to that of Chanute and Iola in *City of Chanute*. For instance, unless an injunction is issued here, the Cities stand to lose a potential supplier of low-cost, long-term gas—a supply which may be necessary to meet the Cities' long-term gas needs. Moreover, it is difficult to estimate the effect of the loss of such gas on the Cities' customers—whether residential, commercial or industrial.

Williams contends that even if the Cities were to lose the Vesta supply of gas, the Cities would not be irreparably harmed because there are alternative supplies of gas available to the Cities at comparable or perhaps even better prices.

First, WNG cites the availability of 451 gas as an "alternative" source of gas to the Cities. WNG asserts that "enough gas will be available to the Cities through the Order 451 GFN process to satisfy the Cities' combined peak day requirements 10 times over." (Def.'s Brief, p. 42.) Defendant's argument is misplaced. Plaintiffs have never suggested that there is not enough gas available to satisfy their needs. Rather, the issue is whether the Cities have been irreparably harmed by their inability to purchase low-cost, long-term gas from a dependable third party supplier and to have that gas transported over Williams' pipeline.

While it is true that if the Cities were to purchase 451 gas WNG would be required to transport the gas over its line, it is also true that the Cities have not yet received any offers for 451 gas comparable to the supply they can obtain from Vesta. Fur-

---

power on January 1, 1984. The City of Fredonia contracted with the Kansas Municipal Energy Agency to begin receiving power from the Nearman Creek Generating Plant on June 1,

1983, and was liable for demand charges whether or not the energy was transmitted. 564 F.Supp. at 1418.

ther, Order 451 provides that the producer need only offer the released gas to a pipeline's customers *after* the pipeline's offer has been rejected, and *after* an offer from a third party has been obtained. Therefore, it seems unlikely that the Cities will be able to obtain 451 gas comparable in price and term to that obtained through Vesta. In any event, as stated earlier, the 451 gas which has been offered to the Cities to date has been unacceptable either because of price or term or other conditions attached to the offer.

Defendant also suggests that in addition to the availability of 451 gas, the Cities have available substantial volumes of "local gas".[5] Defendant points out that the City of Chanute currently has a contract to purchase local gas from Chooch, Inc. and a pipeline from Chooch's wells to the City is nearly complete. Additionally, the City of Neodesha is currently connected to the local gas supply of Willis Gas Company and has purchased some gas from Willis in the past.

The evidence showed, however, that the Chooch contract covered only a small percentage of Chanute's total requirements and was not contemplated to save the City's long-term needs. Moreover, the City of Neodesha is no longer purchasing gas from Willis because of quality problems experienced with Willis' gas in the past.

The evidence simply does not show that local gas of sufficient quality, price and volume is available to satisfy the needs of the Cities on a long-term basis. Further, even if the local gas did meet all of the necessary criteria, since Williams' pipeline is closed, the Cities in most instances would be required to construct pipelines from the gas reserves to the Cities. This is neither a feasible nor reasonable alternative.

The court therefore holds that the Cities have sufficiently shown that they will suffer irreparable injury unless the injunction issues.

**Balance of Harms**

█ Plaintiffs must next show that the threatened injury to plaintiffs outweighs whatever damage the proposed injunction may cause defendant. This element presents a difficult question, as both the Cities and WNG argue they will suffer injury if the court were to impose an injunction. However, for the reasons detailed below, the court finds the balance of hardships must weigh in favor of the Cities in this case.

The Cities point to the loss of an inexpensive, long-term gas supply, higher prices to customers and the potential loss of businesses and sales as evidence that the injury to the Cities, if the injunction is not granted, would outweigh any injury to the defendant if the injunction is granted. WNG maintains, however, the balance of harms must lie in its favor because of the substantial take-or-pay exposure it would allegedly incur if the injunction is granted.

WNG, relying on § 4(b) of the NGA, reasons that if the court orders WNG to open access to its pipeline to the plaintiff cities, Williams would subsequently be forced to open access to its pipeline on a system-wide basis.

Section 4(b) of the NGA provides:

(b) No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any *undue* preference or advantage to any person or subject any person to any *undue* prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

15 U.S.C. § 717c(b) (emphasis added).

Based on this statute, Williams argues FERC would not permit WNG to provide transportation service to the Cities alone, but instead would require that any service offered to the Cities be offered to all WNG customers on a nondiscriminatory basis.

---

**5.** WNG's full requirements contracts with the Cities contain an exception which permits the Cities to purchase "local gas" from a third party without violating their full requirements contracts. While "local gas" may be defined in various ways, when used in this case it refers to gas reserves located in geographic proximity to the plaintiff Cities.

Further, Williams estimates that under system-wide open access, transportation service would substantially displace gas sales and the company would be subject to take-or-pay exposure in the amount of $90 million to $140 million. WNG reasons that the injury to WNG in the form of take-or-pay exposure would outweigh the "small benefit" of reduced gas rates to the Cities.

Noting that § 4(b) of the NGA prohibits only "undue" or "unreasonable" differences, the Cities argue that a difference in the treatment or services provided to WNG's customers would not by itself violate the NGA. *See Michigan Consol. Gas Co. v. Federal Power Commission,* 203 F.2d 895, 901 (3d Cir.1953). Further, the Cities correctly point out that this court has not been asked to open access to WNG's entire pipeline. Rather, the issue currently before this court is whether Williams maintains an intentional monopoly in the eight cities which are parties to this action, and whether the Cities are entitled to a preliminary injunction ordering WNG to open its pipeline to those cities.

Accordingly, the court concludes that an injunction ordering Williams to open its pipeline to the plaintiff Cities would result in only minimal take-or-pay exposure to the defendant, while a denial of the requested injunction may result in the loss to the Cities of a steady, assured supply of natural gas at a price far more reasonable than that presently assessed by Williams.

Public Interest

■ The issue of whether the injunction, if issued, would adversely affect the public interest requires an examination of the effect of an injunction on the customers of the Cities as well as the effect of an injunction on WNG's customers.

There can be no doubt that substantially lower wholesale gas prices would benefit, rather than adversely affect, the customers of the plaintiff Cities, as the Cities would pass the cost savings on to their retail customers.

WNG once again suggests that it will be exposed to substantial take-or-pay liability if the court grants the requested injunction, and it is likely that at least part of

these costs will ultimately be passed on to all of WNG's customers, thereby adversely affecting the public interest.

As already discussed, such an argument improperly clouds the issue in this case. This court has not been asked to order open access to Williams' entire pipeline—or to, in effect, force Williams' compliance with Order No. 436. Rather, this court is here concerned only with whether WNG has an intentional monopoly in the eight plaintiff cities in violation of § 2 of the Sherman Act. Moreover, as this court commented in its ruling from the bench on this motion, it cannot be in the public interest for anyone to be forced to accept WNG gas at its present rate, knowing full well that such rate is not competitive in a real world setting.

Accordingly, the court finds the grant of the requested injunction would not adversely affect the public interest.

The final element plaintiffs must show is that they can demonstrate a likelihood of success on the merits.

As earlier stated, where the first three requirements are met, the moving party's burden of proof on the fourth requirement is lessened. Accordingly, plaintiffs will satisfy the fourth requirement if they raise questions going to the merits "so serious, substantial, difficult and doubtful" as to make them a fair ground for litigation and thus for more deliberate investigation.

■ In order to prevail on the merits, plaintiffs must prove the defendant has violated § 2 of the Sherman Act. The offense of monopolization under § 2 of the Sherman Act has two elements:

(1) The possession of monopoly power in the relevant market; and

(2) The willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *see also Bright v. Moss Ambulance Service,* 824 F.2d 819, 823

(10th Cir.1987); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1519 (10th Cir.1984), *aff'd,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). The Tenth Circuit has defined monopoly power as the ability to control prices and exclude competition. While the two elements are closely related, both must be demonstrated to establish the existence of monopoly power. *Bright v. Moss Ambulance Service, Inc.,* 824 F.2d at 824 (*citing Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.,* 783 F.2d 159, 164 [10th Cir.1986]).

Plaintiffs seek to prove liability under § 2 by utilizing the "essential facilities" or "bottleneck" doctrine. Under this doctrine, a business or group of businesses which control a scarce facility has an obligation to give competitors reasonable access to it. *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 856 (6th Cir.1979). The bottleneck theory differs from traditional monopolization analysis in that the intent factor is de-emphasized and emphasis is placed instead on the surrounding market conditions. Kintner, Federal Antitrust Law § 10.25 n. 484 (1980). Further, the doctrine is particularly applicable to natural gas pipelines and their refusal to transport third party gas. McNulty, *Freeing the Captives: Nondiscriminatory Access to Transportation in the Interstate Gas Market,* 47 U.Pitt.L.Rev. 843 (Spring 1986).

The Tenth Circuit Court of Appeals recently discussed and applied the doctrine in *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509. The court there defined the four elements necessary to establish liability under the essential facilities doctrine as follows:

(1) Control of the essential facility by a monopolist;

(2) A competitor's inability to duplicate the facility;

(3) Denial of the use of the facility to a competitor; and

(4) The feasibility of providing the facility.

738 F.2d at 1520 (*quoting MCI Communications v. AT & T,* 708 F.2d 1081, 1132–33 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983)).

Prior to discussing the application of each of the above elements, a preliminary issue must first be addressed. Specifically, plaintiffs contend that when the "essential facilities" doctrine is utilized, proof of its elements is proof of monopoly power, and plaintiffs need not show "the relevant market". Defendant, on the other hand, argues proof of the relevant market is always a threshold element in determining whether there has been a violation of § 2 of the Sherman Act.

In support of its contention, defendant cites *Consul Ltd. v. Transco Energy Co.,* 805 F.2d 490 (4th Cir.1986). In *Consul,* as in the instant case, plaintiff urged the court to find that under the "essential facilities" doctrine, the court need not concern itself with market definition. The Fourth Circuit Court of Appeals, after reviewing a number of "essential facility" cases, ruled that the relevant market must be proven regardless of the type of § 2 claim utilized by plaintiff. 805 F.2d at 494.

Conversely, plaintiffs contend market analysis is not an indispensable means of proving monopoly power. Plaintiffs cite *Woods Exploration & Producing Co. v. Aluminum Company of America,* 438 F.2d 1286 (5th Cir.1971), in support of their contention. In *Woods,* owners of wells in the Appling Field in Texas filed an antitrust action against other producers, contending the defendants possessed monopoly power over the extraction of gas from the Appling Field, and that the relevant area of competition was the field. The court held:

"When one must look for a monopoly, determining a relevant market in which to look and in which to evaluate competitive effects is obviously an essential first step. But when, with an illegal practice such as is present here in mind, one can look at an area and see the existence of monopoly power, not by inference from market share, but by determining actual ability to exclude competition and control prices, there appears no real need to go further."

438 F.2d 1306 (*quoting Denver Petroleum Corp. v. Shell Oil Co.*, 306 F.Supp. 289 [D.Colo.1969]).

The *Woods* court, however, then went on to find that the Appling Field was the relevant market and to determine that the defendant possessed monopoly power in that field. Hence, the *Woods* case does not stand for the proposition advanced by plaintiffs here.

■ The court thus holds the existence or absence of monopoly power cannot be determined in a vacuum but rather must be measured within a defined market. 3 Von Kalinowski, Antitrust Laws and Trade Regulation § 8.02[2] (1986). While it is certainly true that under the "essential facilities" doctrine, analysis of the relevant market may not take on the same implications as it does in other cases, this court concurs with the *Consul* court's determination that the "relevant market" must be proven in every case.

■ Determining the relevant market typically requires an inquiry into the nature of the product and the geographical area of effective competition. The relevant product market is generally defined to be that area of goods or services in which the product or products offered by the defendant effectively compete while the relevant geographic market is generally defined to be the geographic area of effective competition in which the product or services is traded. *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 388, 76 S.Ct. 994, 1003, 100 L.Ed. 1264 (1956).

With that stated, the court finds the relevant product market in this case is natural gas. It has not been shown that there is an adequate substitute for natural gas that would be acceptable to the large majority of industrial, commercial, or residential consumers of the Cities. Nor has it been shown that sufficient interchangeability exists between gas and other sources of energy. As for the relevant geographic area, it is clear to the court that while Williams Natural Gas Company operates in a several state geographic area, the plaintiff Cities can practicably turn to supplies only through Williams. Thus, the court concludes the relevant geographic market in this case is the area encompassing the plaintiff Cities.

With this determination of the relevant market in mind, the court now moves on to a consideration of whether this case satisfies the elements of the "essential facilities" doctrine.

The first element, control of the essential facility by a monopolist, has been met here. WNG owns the only natural gas pipeline connected to the plaintiff Cities and also maintains complete control over that pipeline. If WNG refuses to transport third party gas to the Cities, the Cities simply cannot compete for or obtain such gas.

The second element requires a showing of the competitor's inability to duplicate the essential facility. This element must be broken down into two questions for purposes of the court's analysis: (1) do the Cities compete with WNG; and (2) can the Cities duplicate the essential facility?

■ The essential facility doctrine is applicable only where the firm which controls the essential facility refuses to allow access to the facility to a competitor. *Olympia Equip. Leasing v. Western Union Telegraph*, 797 F.2d 370, 376–77 (7th Cir. 1986); *MCI Communications v. AT & T*, 708 F.2d at 1147 n. 100. Thus, Williams reasons that the Cities in this case are "customers" rather than "competitors" of WNG and cannot utilize the essential facility doctrine.

The Cities do not attempt to argue that competition exists between Williams and the Cities for retail customers. Rather, the Cities point out that Williams directly serves a number of industrial customers within and around the Cities—customers the Cities could potentially serve if the Cities could obtain lower priced gas.

WNG counters that direct sales to end users comprise only about 16% of its total sales. Further, WNG's president and vice president testified at the hearing that WNG has always viewed the Cities as customers rather than competitors.

Regardless of how small a percentage of WNG's business consists of direct sales, and regardless of how WNG views the plaintiff Cities, the court finds the Cities do compete to some degree with WNG for direct sale customers. Moreover, there is no question that by denying access to its pipeline to Vesta and other potential suppliers, WNG has foreclosed competition and prevented the plaintiff Cities from obtaining competitively priced gas. Thus, the court finds plaintiffs are entitled to utilize the essential facility doctrine.

■ Plaintiffs must next show that they are unable to "duplicate" the essential facility. This element does not require plaintiff to show that it would be impossible to duplicate the facility or that the facility is indispensable. Rather, it is sufficient if duplication of the facility would be economically infeasible, and if denial of its use would inflict a severe handicap on potential market entrants. *Fishman v. Estate of Wirtz,* 807 F.2d 520, 539–40 (7th Cir.1986); *Hecht v. Pro–Football, Inc.,* 570 F.2d 982, 992 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Consolidated Gas Company of Florida, Inc. v. City Gas Company of Florida,* 665 F.Supp. 1493, 1534 (S.D.Fla. 1987).

While conflicting evidence was presented at hearing regarding the cost to the Cities of constructing a four-inch pipeline (estimates range from $10,000/mile to $50,-000/mile), the court finds that constructing such a pipeline is neither feasible nor required.

Defendant additionally suggests that the fact that two cities are currently connected to local gas supplies is evidence that the Cities are able to duplicate defendant's facility.

In *MCI Communications v. AT & T,* 708 F.2d at 1147, the court, faced with an analogous situation, held that the fact that MCI was building its own facilities in at least one area was not evidence that it could duplicate AT & T's local service facilities at every point. Similarly, in this case the evidence does not show that each of the plaintiff Cities is capable of constructing a

pipeline to local gas supplies. More importantly, the evidence does not show that even if such pipelines were built that local gas supplies would be of the same quality, dependability or price as could be obtained through access to Williams' pipeline. The court therefore finds that plaintiffs are unable to duplicate the essential facility.

Thirdly, the Cities must show denial of use of the facility to a competitor.

· ■ WNG argues it has not denied use of the pipeline to the Cities because it continues to supply gas to them through its pipeline, and further, because WNG is required to transport 451 gas to the Cities if they should contract for such gas with the producer. As previously discussed, 451 gas has not been shown to be available to the Cities on a long-term, low-cost basis. Moreover, while WNG continues to provide the Cities with its own gas, it has denied the Cities the opportunity to use the facility to purchase third party gas. Accordingly, the court finds the third element has also been met.

■ Finally, the Cities must show it is feasible for WNG to provide its facility to the plaintiffs.

WNG · has contended throughout these proceedings that it cannot feasibly open access to its pipeline because to do so would result in substantially reduced sales and increased take-or-pay exposure.

First, the court has already determined that if it were to order open access only to the eight plaintiff Cities, minimal or no take-or-pay exposure would be incurred by defendant. Further, WNG would continue to receive a transportation fee in exchange for transporting third party gas to the Cities.

Secondly, even if take-or-pay exposure was incurred by the defendant as a result of this court's order, the "justification of self-preservation" has not been successfully asserted as a defense to denial of access to an essential facility. *Consolidated Gas Company of Florida v. City Gas Company of Florida,* 665 F.Supp. at 1536. A similar argument to that made by the de-

fendant here was made in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In *Otter Tail*, an electric power company was held to have violated § 2 of the Sherman Act by monopolizing and attempting to monopolize the retail distribution of electric power in its service area by attempting to prevent communities in which its retail distribution franchise had expired from replacing it with a municipal distribution system. The power company argued that if it did not prevent the establishment of municipal electric systems, more and more municipalities would turn to public power and the company would go downhill. The Supreme Court held:

> The argument is a familiar one. It was made in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 18 L Ed 2d 1249, 87 S Ct 1856, a civil suit under § 1 of the Sherman Act dealing with a restrictive distribution program and practices of a bicycle manufacturer. We said: "The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct." Id., at 375, 18 L Ed 2d 1249 [87 S.Ct. at 1863].
>
> The same may properly be said of § 2 cases under the Sherman Act. That Act assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency. Otter Tail's theory collides with the Sherman Act as it sought to substitute for competition anticompetitive uses of its dominant economic power.

410 U.S. at 380, 93 S.Ct. at 1031 (footnote omitted).

Accordingly, the court finds the defendant cannot rely on the threat of take-or-pay exposure as a defense to the Cities' antitrust claim. The Cities have shown it is feasible for WNG to provide its facility to plaintiffs.

Plaintiffs have thus established the likelihood they will prevail on their "essential facility" claim and have raised questions going to the merits "so serious, substantial, difficult and doubtful as to make them a fair ground for litigation." With this determination made, plaintiffs have satisfied each of the requirements necessary to obtain a preliminary injunction.

IT IS ACCORDINGLY ORDERED this 5th day of February, 1988, that plaintiffs' motion for preliminary injunction is granted. Defendant is ordered to open access to its pipeline to the eight plaintiff Cities for the transport of third party gas. The Cities are thus advised to formalize their respective contracts for the purchase of gas from Vesta. Once such contracts are in place, the Cities will have waived their present contracts with Williams and any rights or claims that may exist under those contracts.

A status conference is scheduled in chambers on February 26, 1988, at 1:00 P.M.

## MEMORANDUM ORDER

### On Motion to Modify

Defendant Williams Natural Gas Company ("WNG") has filed a motion to modify in two respects the preliminary injunction entered herein on February 5, 1988. The court has reviewed Williams' brief with attachments, being an emergency application for temporary and permanent certifications of public convenience and necessity by the Federal Energy Regulatory Commission ("FERC"). Ironically, WNG seemingly represents to FERC that it intends to appeal this court's order of February 5, 1988, and seek a stay of its implementation before the Tenth Circuit Court of Appeals.

Notwithstanding, Williams seeks recasting of this court's order to enable the parties to perform certain predicate acts as follows:

A. Direct each plaintiff electing to receive relief under the injunction to furnish WNG by a date certain with the data, documents and information required by law (18 C.F.R. § 157.5 *et seq.*) for a complete filing with the Federal Energy Regulatory Commission ("FERC") seeking regulatory authority to transport third-party natural gas in interstate commerce pursuant to § 7(c)

of the Natural Gas Act ("NGA"), 15 U.S. C. § 717f(c), and corresponding abandonment of existing sales service under § 7(b) of the NGA, 15 U.S.C. § 717f(b);

B. Permit WNG a reasonable time (at least until the status conference set for February 26, 1988) within which (a) to supplement and complete the NGA § 7 application, (b) to complete and deliver the appropriate transportation agreements to the electing plaintiffs for execution, and (c) to receive from the electing plaintiffs the completed documentation and required data in order for WNG to file the same promptly with the FERC as a supplement to the NGA § 7 application; and

C. Grant WNG and the electing plaintiffs a reasonable time to obtain from the FERC emergency approval of the NGA § 7 application, during which period the injunction shall be suspended until the FERC acts so long as the parties diligently pursue the matters set forth above.

In the court's view, the referred requisites are those contemplated and implied by the findings and directive in the February 5, 1988 order. However, the effect of the court's directive and its implementation need not be stayed in the process.

Next, WNG seeks limitation of the transport and distribution of third party gas to the cities, asserting that the order should only apply to direct sale industrial customers now served by WNG or potential customers served by the Cities, and no other.

In this regard, given the findings, it is this Court's intention that the Cities are at liberty to timely contract for third party gas to be transported by WNG in sufficient quantums to serve all of the Cities' present customers, i.e., industrial, commercial and/or residential.

IT IS ACCORDINGLY ORDERED this 9 day of February, 1988, that defendant Williams Natural Gas Company's motion to modify preliminary injunction is overruled.