CITY OF CHANUTE, KANSAS; City of Auburn, Kansas; City of Cleveland, Oklahoma; City of Garnett, Kansas; City of Humboldt, Kansas; City of Iola, Kansas; City of Neodesha, Kansas; and City of Osage City, Kansas, Plaintiffs,

v.

WILLIAMS NATURAL GAS COMPANY, Defendant.

No. 87–1463–K.

United States District Court, D. Kansas.

July 27, 1990.

Charles F. Wheatley, Jr., Don Charles Uthus, Peter A. Goldsmith, Wheatley and Wollesen, Annapolis, Md., Larry D. Hendricks, Ronald Greg Wright, Stumbo, Stumbo, Hanson & Hendricks, Topeka, Kan., for plaintiffs.

Donald W. Bostwick, Adams, Jones, Robinson and Malone, Wichita, Kan., John T. Schmidt, Mary Rounds, Kevin Morrison, Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, Okl., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This is an antitrust case in which the plaintiffs (the Cities)[1] claim they are entitled to treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, because defendant Williams Natural Gas Co. (WNG or Williams)[2] reversed its policy of interim open access. The Cities assert that Williams' conduct in closing its pipeline was an exercise of its monopoly power which injured the Cities by preventing them from receiving transportation of a long-term, dependable supply of low cost natural gas from a third party supplier over Williams' natural gas pipeline. This case is now before the court on motions by Williams for summary judgment on the Cities' remaining antitrust claims and to strike some of the Cities' affidavits filed in opposition to Williams' motion for summary judgment.

In its motion for summary judgment, Williams argues that the record in this case demonstrates WNG has not abused its monopoly power, that the Cities cannot prove their essential facility claim, and that since WNG had the right to sell gas under its FERC tariff and certificates, an exercise of that right is not actionable under the essential facilities doctrine. As a result, Williams argues that the Cities cannot establish a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus, it is entitled to summary judgment pursuant to Fed.R.Civ.P. 56(d).

As is more fully developed herein, the court finds that Williams' motion to strike some of the Cities' affidavits should be denied in part and granted in part. In addition, the court finds that Williams' motion for summary judgment on the Cities' remaining antitrust claims should be granted.

The current motions are not ruled on from a clear slate. This case has already been before the court on two separate occasions for findings of fact and conclusions of law. *City of Chanute, Kan. v. Williams Natural Gas Co.,* 678 F.Supp. 1517 (D.Kan.1988) (hereinafter, *Chanute I*); and *City of Chanute, et al. v. Williams Natural Gas Co.,* Case No. 87–1463–K, 1990 WL 20019 (D.Kan. Feb. 19, 1990) (hereinafter, *Chanute II*). Since those cases have already set forth the fac-

---

1. The original plaintiffs include the following cities: Chanute, Auburn, Garnett, Humboldt, Iola, Neodesha, and Osage City, Kansas, and Cleveland, Oklahoma.

2. Williams Natural Gas Company's predecessor, Northwest Central Pipeline Corp., will also be referred to herein as Williams or WNG—it is not necessary for the court to make a distinction between the two companies for any issue now before the court.

tual background of this case, the court will not reiterate such for purposes of the present motions. The court will set forth a summary of the findings in those cases, however, to clarify the context from which the present motions arise.

In *Chanute I* this court addressed the Cities' request for a preliminary injunction. In regard to the prerequisites for a preliminary injunction, the court found that the Cities had: (1) shown that they would suffer irreparable injury unless an injunction was issued, (2) proved that their threatened injury outweighed the damages which a preliminary injunction may cause to Williams, and (3) shown that issuing an injunction would not be adverse to the public interest. *Chanute I*, 678 F.Supp. at 1526–30. Since the first three prerequisites for a preliminary injunction were found to be present, the court applied a "lessened" burden of proof on the fourth requirement. *Chanute I*, 678 F.Supp. at 1525–26. In other words, the Cities were only required to prove that they had "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

With that standard in mind, the court addressed the merits of the Cities' claim that Williams' failure to open access to its pipeline to alternate suppliers of natural gas constituted an intentional monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The Cities sought to prove liability under Section 2 of the Sherman Act by utilizing the "essential facilities" or "bottleneck" doctrine. *Chanute I*, 678 F.Supp. at 1531. This court ultimately found that, as the facts then appeared before the court, and given the fact that the lesser standard was applicable, the Cities had sufficiently established the likelihood they would prevail on their essential facilities claim. *Id.* at 1534. As a result, it was determined that the Cities had established each of the necessary requirements for the issuance of a preliminary injunction.

In *Chanute II*, the court addressed Williams' three separate motions for partial summary judgment. In the first motion, Williams argued that some of the Cities could not show they suffered an "antitrust injury" because of certain contractual obligations between such Cities and itself, and thus did not have standing to recover treble damages under Section 4 of the Clayton Act. 15 U.S.C. § 15. In its second motion, Williams sought a summary judgment on the Cities' tying claims brought pursuant to Section 1 of the Sherman Act. 15 U.S.C. § 1. In its third motion, Williams sought a summary judgment on the Cities' claims for "extended period damages" (consequential damages covering the period August, 1988 through August, 1993) included within the treble damages claim. *Chanute II*, slip op. at 2–3.

In *Chanute II*, the court granted Williams' first motion for summary judgment to the extent that such Cities were contractually obligated to purchase their gas requirements from Williams during the period Williams' pipeline was closed to transportation of third party gas. More specifically, the court found that the Cities of Auburn, Iola, and Osage City were contractually obligated to purchase their requirements from Williams during the entire closed period (August 1, 1987 through August 5, 1988), and that the Cities of Chanute, Neodesha, and Humboldt were contractually obligated to purchase their requirements from Williams prior to April 22, 1988. The court ultimately found that to the extent such contractual obligations were enforceable, such Cities could not have suffered any antitrust injury and thus lacked standing to recover treble damages under Section 4 of the Clayton Act. *Chanute II*, slip op. at 35.

The court also found that Williams' motions for summary judgment on the Cities' tying claims brought pursuant to Section 1 of the Sherman Act should be granted. *Chanute II*, slip op. at 41. However, the court denied in substantial part Williams' request for summary judgment on the Cities' claims for extended period damages. *Chanute II*, slip op. at 43.

■ As a result of such findings, only a few of the Cities' original claims remain. For instance, the claims of the Cities of Cleveland and Garnett remain to the extent

those Cities can show they sustained injury as a result of an antitrust violation by Williams under Section 2 of the Sherman Act. In addition, the claims of the Cities of Chanute, Neodesha, and Humboldt remain only to the extent such Cities can show an antitrust violation by Williams under Section 2 of the Sherman Act which injured such Cities and occurred after April 22, 1988.[3]

In the January 29, 1990 oral arguments for *Chanute II*, the court noted the limited number of remaining claims and suggested that Williams stand ready to file a summary judgment motion on the remaining Sherman Act Section 2 claims after the court issued its findings of facts and conclusions of law in *Chanute II*. (Docket No. 248, pp. 73–74.) Since the essential facilities doctrine is a Sherman Act Section 2 claim, the court noted that such a motion would likely address the propriety of such doctrine. In addition, the court indicated that even though this court relied on the essential facilities doctrine for issuance of the temporary restraining order in *Chanute I*, to grant summary judgment now on such theory in favor of Williams would not necessarily be in conflict with *Chanute I*, given the fact that a different standard applied to granting a preliminary injunction and that the facts now appear much differently since the parties have had an opportunity to conduct extensive discovery. The court also noted that the extent of the regulatory turmoil and its effect on Williams' conduct is much clearer now than it was in *Chanute I*. (*See* Docket No. 248, pp. 74–76.)

■ In a telephone conference held on March 20, 1990, the court addressed the Cities' request for an interlocutory appeal from *Chanute II*. (Docket No. 256.) The parties were informed that the court agreed the Cities were deserving of an interlocutory appeal, but that the court faced a dilemma in currently granting such a request. The court felt that this whole case was deserving of timely review by the Tenth Circuit, including the Cities' essential facility claim as well as their other Sherman Act Section 2 claims. (*Id.* at 3.) However, if the court immediately granted the interlocutory appeal, it would lose jurisdiction and the Tenth Circuit would not have before it the remaining claims. (*Id.*) Thus, the court suggested it may be better to suspend the interlocutory appeal until after the court had ruled on Williams' current motion for summary judgment against the Cities' Sherman Act Section 2 claims. (*Id.* at 4.)

Counsel for Williams concurred that this was a sensible procedure and agreed not to argue that the Cities' appeal from *Chanute II* was untimely if the court allowed the Cities' request for an interlocutory appeal to be suspended until after the court ruled in this case. (Docket No. 256, p. 5.) Counsel for the Cities acknowledged that such a procedure would be beneficial if it would decrease the possibility of having to retry something, but then wanted to note to the court that they still believed, as more specifically set forth in the Cities' motion to reject defendant's fourth summary judgment motion filed March 20, 1990, that such motion by Williams should not be considered by the court because it was untimely. Counsel for the Cities based his argument on this court's October 23, 1990 scheduling order, in which the court set December 1, 1990 as the final date for the filing of all summary judgment motions.

In response to such arguments, the court found that Williams' fourth summary judgment request was timely because the court had suggested its filing. (*Id.*, p. 10.) The

3. The Cities assert that such a finding "is incorrect because five of the Cities were denied access to outside supplies of boiler fuel gas from Vesta/Edison by WNG's closing, since WNG's inconsistent contracts for such fuel had only 30-day terms." (WNG's Final Summ. Judg. Motion, Cities' Response Brief, p. 1, n. 2.) What claim such an assertion supports is left unclear by the Cities' brief. Furthermore, in the agreed pretrial order filed November 15, 1989, the Cities only request the court to find violations of Sections 1 and 2 of the Sherman Act and only request damages recoverable pursuant to Section 4 of the Clayton Act. (*See* Docket # 209, pp. 2–4.) Since the general rule is that the pretrial order controls the subsequent course of action unless modified to prevent manifest injustice, and since no request to modify and the requisite circumstances have not been presented to the court, the Cities' claims are limited to those set forth in the agreed pretrial order. Fed.R.Civ.P. 16(e).

court herein adopts such findings and further adds that it requested Williams to file its motion testing the propriety of all of the Cities' claims because of recent developments in the case law which shed much light on the issue of the reasonableness of Williams' conduct in light of the regulatory turmoil which was present. *See State of Ill. ex rel. Hartigan v. Panhandle Eastern Pipe Line*, 730 F.Supp. 826 (C.D.Ill.1990) (hereinafter, *Panhandle* ). In addition, allowing Williams to file its current summary judgment motion and suspending the Cities' request for interlocutory appeal until after the court has ruled on Williams' current motions serves the purpose of conservation of court resources.

For example, since the court has employed this procedure, the whole case will be appealable to the Tenth Circuit at the same time. Thus, if it is necessary to retry this case, the parties will have assurance that the case is being tried on the correct law. This rationale is especially compelling in a complicated antitrust case such as the present matter since it presents many novel questions. Thus, based on the above rationale, the court specifically finds that good cause has been shown for modifying its scheduling order. Fed.R.Civ.P. 16(b).

## STANDARD OF REVIEW

Since the court in *Chanute II*, slip op. at 4–8, has already set forth the appropriate standard of review to be used in evaluating summary judgment motions in this case, the court will not reiterate those principles but will adopt and use them to evaluate the present motion for summary judgment.

In announcing said standards in *Chanute II*, the court did not specifically address Williams' motion to strike plaintiffs' affidavits since the court felt the use of general standard of review principles was all that was necessary to establish the facts without a genuine material dispute. However, in the current motions before the court, Williams asks the court to more specifically address its second motion to strike plaintiffs' affidavits. Williams asserts that since *Chanute II* "will certainly be appealed to the Court of Appeals, it is essential that the record be clear as to those affidavits which are sufficient under Rule 56(e)

to be considered by the Court." (WNG's Second Motion to Strike, Initial Brief, p. 2, n. 1.) As a result, the court will more specifically address Williams' motions to strike herein.

In relevant part, Fed.R.Civ.P. 56(e) gives the following guidance for sufficient summary judgment affidavits:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits ... must set forth specific facts showing that there is a genuine issue for trial.

*See also, Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir.1988).

### A. The Expert Affidavits

██ Williams argues that the affidavits of Basil Copeland, Edgar H. Bernstein, and Jatinder Kumar fail to meet the requirements of Rule 56(e) because such affidavits are not based on personal knowledge of the affiants nor do they contain admissible facts. The Cities respond that the information in the questioned affidavits would be admissible as expert opinions at trial under Fed.R.Evid. 702–705, and thus should be admissible to defeat a summary judgment motion.

The Tenth Circuit has recognized that an affidavit which fails to meet the requirements of Rule 56(e) is subject to a motion to strike. *Noblett v. General Electric Credit Corp.*, 400 F.2d 442 (10th Cir.1968). However, the commentary on what Rule 56(e) requires in regard to an expert's affidavit has not been very clear.

For instance, some courts and commentators direct the court to consider the following in determining what is allowable in a summary judgment affidavit:

It should be made clear that the policy of Rule 56(e) is to allow the affidavit to

contain all evidentiary matter, which, if the affiant were in court and testifying on the witness stand, would be admissible as part of his testimony. This means that hearsay statements that would be admissible at the trial as exceptions to the hearsay rule may be contained in the affidavit; opinion testimony that would be admissible at the actual trial can be submitted in an affidavit; and relevant and material evidence that is not excluded by the parol evidence rule may be contained in the affidavit.

6 (Pt. 2) MOORE'S FEDERAL PRACTICE ¶ 56.22, pp. 56-752—56-754 (1988) (footnotes omitted). Since the Federal Rules of Evidence allow an expert to testify in the form of opinion (Rule 703) on an ultimate issue (Rule 704), and without prior disclosure of the facts or data underlying the expert's opinion (Rule 705), it has been argued that an expert should have an unfettered ability to set forth his opinions in affidavits, and that such is sufficient to oppose a summary judgment motion. However, this is definitely not the governing rule.

The general rule for what a sufficient affidavit must contain has been eloquently set forth by Judge Kaufman in affirming a summary judgment motion:

> We admit to having been fascinated and intrigued by this tale, which could only be matched by an Ian Fleming novel. To avoid summary judgment, however, a plaintiff must do more than whet the curiosity of the court; he must support vague accusation and surmise with concrete particulars.
>
> . . . .
>
> ... To prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings, Rule 56(e) requires "supporting and opposing affidavits (to) be made on personal knowledge (and to) set forth such facts as would be admissible in evidence." Applegate, however, has submitted an affidavit grounded on suspicion, and bound together with rumor and hearsay. He has provided the court with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.

*Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96-97 (2d Cir.1970).

The problem in regard to an expert's affidavit, however, is that the personal knowledge requirement in Fed.R.Civ.P. 56(e) seems out of place when applied to an expert affidavit at the summary judgment stage, because Fed.R.Evid. 702-705 allow an expert to testify at trial without a personal knowledge of the facts he is testifying about. Most courts which have considered this conflict instruct that two considerations are to be kept in mind in evaluating the expert's affidavit. First, the court must determine whether the expert's opinion would be admissible at trial. Second, any admissible evidence in the affidavit must be examined to determine whether it presents a genuine issue of material fact to prevent summary judgment. *See Mid-State Fertilizer v. Exchange Nat. Bank*, 877 F.2d 1333, 1339-40 (7th Cir.1989); and *Ackerman v. Schwarts*, 733 F.Supp. 1231, 1247 (N.D.Ind.1989).

In determining whether an expert's opinion is admissible at trial, a court must consider the following: whether the person is competent to testify as an expert; whether such testimony would be helpful or assist the trier of fact in its determination or understanding of relevant issues; and whether the facts or data upon which the expert bases his opinion are the types of facts or data reasonably relied upon by experts in the particular field in forming opinions on the subject. Fed.R.Evid. 702, 703. *See also Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir.1988) (a key consideration for determining the admissibility of an expert opinion is whether it will aid the jury in its determination of critical issues in the case); *American Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not."); and *Ackerman*, 733 F.Supp. at 1247 (if the expert's competency to testify as an expert is sufficiently established, then his opinion would be potentially admissible at

trial and should be considered for purposes of summary judgment).

■ However, to hold that an expert's affidavit presents some admissible evidence and is not subject to a motion to strike [4] is not to hold that the expert's affidavit is sufficient to preclude summary judgment. *Mid–State Fertilizer*, 877 F.2d at 1339–40; and *Ackerman*, 733 F.Supp. at 1247. In other words, "[a]dmissibility does not imply utility." *Mid–State Fertilizer*, 877 F.2d at 1339.

The court in *Mid–State Fertilizer* said the following about the requirements for sufficient supporting or opposing affidavits of expert witnesses:

> They shall "set forth facts" and by implication in the case of experts (who are not "fact witnesses") a process of reasoning beginning from a firm foundation. "It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies expressed reasons for judgment."
> ... An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.

877 F.2d at 1339 (quoting *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 627, 64 S.Ct. 281, 299–300, 88 L.Ed. 333 (1944) (Frankfurter J., dissenting)) (other citations omitted). *See also Dart Industries, Inc. v. Plunkett Co. of Oklahoma*, 704 F.2d 496, 498 (10th Cir.1983) ("A party resisting a summary judgment motion must do more than make conclusory allegations, it 'must set forth specific facts showing a genuine issue for trial' "); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value"); *United States v. Various Slot Machines*

*on Guam*, 658 F.2d 697, 700 (9th Cir.1981) ("in the context of a motion for summary judgment, an expert must back up his opinion with specific facts"); and *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977) ("To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than [the expert's] theoretical speculations would seriously undermine the policies of Rule 56").

In sum, to the extent an expert's affidavit contains inadmissible evidence, the affidavit is subject to a motion to strike and will not be considered for purposes of a summary judgment motion. If an affidavit presents an expert's opinion which is admissible in whole or in part, the court will consider such an affidavit to the extent it is admissible.[5]

■ It is important to remember, however, that once the moving party has met its initial burden,[6] a summary judgment motion is not precluded just because the nonmoving party has presented an expert's affidavit which contains some admissible evidence. For instance, a genuine issue of material fact cannot be shown from merely conclusory allegations. In order to be of any value to the judicial process at the summary judgment stage, an expert's opinion must, at a minimum, set forth "a process of reasoning beginning from a firm foundation." *Mid–State Fertilizer*, 877 F.2d at 1339. It is with these standards in mind that the court addresses Williams' motion to strike.

### 1. Affidavit of Basil L. Copeland, Jr.

■ In response to WNG's second motion to strike, the Cities assert that "[i]t is

---

**4.** Just because an affidavit presents some inadmissible evidence does not mean the entire affidavit is to be stricken. *United States v. Alessi*, 599 F.2d 513, 514–15 (2d Cir.1979). A court is free to disregard the inadmissible parts and consider the rest of the affidavit. *Id.* at 515.

**5.** An expert's opinion is admissible in trial so long as: (1) the expert is competent to testify as an expert; (2) the expert's testimony would be helpful or assist the trier of fact in its determination or understanding of the relevant issues;

and (3) if the facts or data upon which the expert bases his opinion are the type of facts or data reasonably relied upon by experts in the particular field in forming opinions upon the subject. Fed.R.Evid. 702, 703.

**6.** *See First National Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968) (shows how the burden of producing the evidence shifts in an antitrust case when the moving party meets its initial burden).

conceded by WNG that Mr. Copeland possesses the necessary qualifications to testify on the matters contained in his affidavit, and that his testimony will aid the trier-of-fact." (WNG's Second Motion to Strike, Cities' Response Brief, p. 6.) In addition, Mr. Copeland, in his affidavit attached to the Cities' response to WNG's second motion to strike, alleges that he based his conclusions on the kind of information experts in his field would reasonably rely upon. (*Id.* at ¶ 12.) These assertions, if true, would meet the requirements of admissibility under Fed.R.Evid. 702 and 703.

' Williams does not make any serious attempt to refute the above assertions of the Cities. Instead, Williams' main argument in support of its motion to strike is that Mr. Copeland's affidavits are primarily conclusory opinions and fail to meet the "specific facts" requirement of Fed.R.Civ.P. 56(e). However, those arguments address the question of whether such an affidavit creates a genuine issue of fact—not whether the affidavit is inadmissible and thus subject to a motion to strike.

Since the requisite facts to establish admissibility of Mr. Copeland's affidavit are essentially unrefuted, Williams' motion to strike Mr. Copeland's affidavit is denied. As to the issue of whether such affidavits are sufficient to create a genuine issue of material fact, the court notes that much of Mr. Copeland's affidavit addresses issues which are not relevant to the current motion for summary judgment and that the affidavit has many conclusory allegations which do not show the necessary "process of reasoning to form a firm foundation." *Mid–State Fertilizer*, 877 F.2d at 1339. However, this is not the place to address that issue. Such issue will be address by the court's findings of facts without a material dispute.

*2. Affidavit of Edgar H. Bernstein*

■ Williams argues that Mr. Bernstein's affidavit "should be stricken in its entirety because it is almost entirely legal argument and unsupported opinion, statements of fact that are not within his personal knowledge, mischaracterizations of

evidence in the record, and statements of hearsay evidence." (WNG's Second Motion to Strike, Initial Brief, p. 10.)

None of the above assertions challenge Mr. Bernstein's competency to testify as an expert or allege that he has relied on facts or data which a reasonable expert in the field would not rely on. In fact, the only assertion that could arguably support a finding that Mr. Bernstein's affidavit is inadmissible is the assertion that the affidavit is mainly a legal argument. That is, to the extent such affidavit is merely a legal argument, it would be inadmissible as being unhelpful and not assisting the finder of fact. *See Specht*, 853 F.2d at 808.

To the extent Mr. Bernstein's affidavit instructs on what this court has already found in this case or consists of legal arguments, the affidavit should be stricken. Such testimony would not be helpful to the trier of fact, and thus would be inadmissible.

■ However, since Williams arguably did raise the issues of whether WNG and the Cities were actually competitors and whether the fact that some of the Cities have access to local gas suppliers indicates the Cities could physically duplicate WNG's system,[7] Mr. Bernstein's affidavit may be helpful to the trier of fact for the determination of these issues. Thus, the court will disregard the inadmissible parts of the affidavit and consider the rest. *Alessi*, 599 F.2d at 515.

At this point, however, the court finds that a line by line determination of what is admissible would be a useless waste of the court's resources. The issue of what specifically is admissible and sufficiently established for purposes of this summary judgment motion will be adequately addressed by this court's findings of fact.

*3. Affidavit of Jatinder Kumar*

■ The above rationale with regard to the affidavit of Mr. Bernstein is equally applicable to the affidavit of Mr. Kumar. That is, although the affidavit may contain some unhelpful legal argument, it also con-

7. (*See* WNG's Final Summ. Judg. Motion, Initial Brief, p. 6, n. 6; and p. 10, n. 8.)

tains some evidence which would be admissible. Thus the court will consider Mr. Kumar's affidavit to the extent it is admissible.

For instance, Williams' brief at page 10, footnote 8, arguably does put at issue the question of whether the fact that a couple of the Cities are connected to a local gas supplier indicates the Cities could physically duplicate WNG's facility. Thus, Mr. Kumar's expert opinion evidence that no reliable local gas was available and that it would be uneconomical for any city to attempt to duplicate WNG's facility may assist the trier of fact.

However, the question of whether the admissible part of the affidavit is sufficient to raise an issue of material fact will be addressed by the hereinafter findings of fact and conclusions of law.

### B. The Lay Witness Affidavits

Williams also argues that the affidavits of lay witnesses Robert Walker and Leo Edison should be stricken because such affidavits fail to meet the requirements of Fed.R.Civ.P. 56(e). Williams argues that the affidavits do not establish that they are based upon the personal knowledge of the affiants, contain admissible facts, and that the affiants are competent to testify to the matters contained in the affidavits as required by Rule 56(e). *See Citizens Environmental Council v. Volpe*, 484 F.2d 870, 873 (10th Cir.1973) (generalized, conclusionary, and unsubstantiated affidavits are insufficient to create a genuine factual dispute; Rule 56(e) requires personalized affidavits to successfully oppose a summary judgment motion); *Bowen Elec. Co. v. J.D. Hedin Constr. Co.*, 316 F.2d 362, 364 (D.C. Cir.1963) (the affiant's competency must affirmatively appear); and *G.D. Searle & Co. v. Chas. Pfizer & Co.*, 231 F.2d 316, 318 (7th Cir.1956) (the parts of an affidavit which do not meet the requirements of Rule 56(e) must be disregarded).

#### 1. Robert Walker

Williams attacks Mr. Walker's competency to testify on behalf of all of the Cities. In their response, the Cities do not attempt to argue that Mr. Walker is competent to testify on the behalf of any city except Chanute (Williams does not dispute that Mr. Walker is competent to testify on the behalf of the City of Chanute). Thus, the court finds that Mr. Walker is only competent to testify on behalf of the City of Chanute. However, it must also be noted that the Cities only have to establish there is a genuine issue of material fact to prevent this summary judgment motion and that all reasonable factual inferences must be resolved in their favor. *E.g., Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985). Thus, if Mr. Walker's affidavit relates facts from his personal knowledge which raise a genuine issue of material fact in regard to Williams' conduct with the City of Chanute, such would also likely prevent summary judgment against the other Cities since a reasonable inference would be that such conduct applied to the other Cities as well.

Williams also asserts that Mr. Walker is not competent to give his opinions or interpretations of the intent of FERC in issuing its orders. In addition, Williams argues that Mr. Walker is not competent to give his opinion on WNG's intent behind its actions.

The Cities do not argue that Mr. Walker is an expert. Thus, if any opinion testimony is to be allowed in his affidavit it will have to be allowable under Fed.R.Evid. 701. The first requirement of Rule 701 is that the lay opinion or inference be "rationally based on the perception of the witness." Mr. Walker's affidavit does not detail how he formed these opinions. Thus, the court must conclude that such opinions were not rationally based on his perceptions.

However, to the extent Mr. Walker's affidavit relates the type of gas the Cities needed and WNG's course of conduct under its existing contract, the court will assume such statements are based on his personal knowledge as City Manager of the City of Chanute. In addition, since party admissions are properly allowable in affidavit as an exception to hearsay, the court will allow Mr. Walker's affidavit to be considered to the extent it

relates statements made to him by WNG personnel.

Therefore, to the extent that Mr. Walker's affidavit contains matters which do not fall into one of the above categories, the court finds either that such are not relevant to the issues before the court, do not relate facts from his personal knowledge, or are not facts on which he is competent to testify, and that such should be stricken from the record.

### 2. Affidavit of Leo Edison

Williams argues that the affidavit of Leo Edison is improper because it attempts to set forth factual disputes by contradicting his earlier deposition testimony. Williams cites four parts of Mr. Edison's affidavit as being directly contrary to his earlier deposition testimony.

■ The court will only disregard an affidavit submitted in opposition to a summary judgment motion that is contrary to prior sworn statements by the affiant if the subsequent contrary affidavit constitutes an attempt to create a sham factual issue. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). The *Franks* court also instructed that the following factors were relevant in the determination of a sham fact issue:

> [W]hether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

796 F.2d at 1237.

In addition, a distinction must be drawn between discrepancies which create a "transparent sham" and discrepancies which merely go to the weight of the evidence—creating an issue of credibility. *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986).[8] One way to make such a distinction is by only disregarding an affidavit as a sham if the affiant's prior testimony gave "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, [and thereafter tries to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Assoc. v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir.1984). *See also Franks*, 796 F.2d at 1237 (in finding a sham factual issue the Tenth Circuit said "his affidavit makes no reference to his earlier contrary statements, and his earlier testimony is unequivocal"). Furthermore, the court must keep in mind that everything in the record must be considered together with the affidavit in question, and all doubts must be resolved in favor of the nonmoving party. *Tippens*, 805 F.2d at 954. It is with these factors in mind that the court addresses Williams' specific concerns.

■ Williams first asserts that Mr. Edison's statement at paragraph 2 of his affidavit, which states in reference to his November 1, 1988 contract with Vesta that he "concluded that the earlier [January 29, 1987] contract was not enforceable and mutually agreed with Vesta to the new contract," is contrary to the following previously given deposition testimony:

> Mr. Schmidt: Okay. And was there any sort of a writing that reflected the termination of this agreement and its replacement by a new agreement?
>
> Mr. Edison: No. I don't think the replacement agreement says that this contract is null and void. I think *this [January 29, 1987] contract still*

---

**8.** The court in *Tippens*, 805 F.2d at 953–54, gave the following rationale for such a distinction:

> The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine

which point in time and with which words the witness ... was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.

*stands;* but, of course, we're using the terms and conditions of the replacement agreement at this time.

Mr. Schmidt: Okay. So when you say this agreement, meaning Exhibit 10, still stands, do you mean it could be still in force and effect or—well, what do you mean?

Mr. Edison: Well, let me put it this way. I think that *if I wanted to press the issue we could probably continue to operate under this [January 29, 1987] original agreement.*

(WNG's First Motion to Strike, Initial Brief, p. 8) (emphasis original).

Although there are some discrepancies between the affidavit and the earlier deposition testimony, the deposition statements cannot be considered "clear answers to unambiguous questions" and "unequivocally" contrary to the affidavit statement. Mr. Edison's deposition testimony does not state that both parties agreed the January 29, 1987 contract controlled when the pipeline opened after July 22, 1988. Furthermore, it would be reasonable to infer that Mr. Edison intended his deposition testimony to mean that although he believed the January 29, 1987 contract had not been terminated, due to a substantial change in circumstances since the contract was entered into, such contract could only be enforced by litigation if a conflict arose, and that he believed he would win in such a case. If this was Mr. Edison's understanding, it would explain why he "mutually agreed with Vesta to the new contract" —to avoid litigation costs and in recognition that there had been a substantial change in circumstances. Thus, since the statement in the affidavit in question is not unequivocally contrary to Mr. Edison's earlier testimony, the court finds such is not a "transparent sham."

██ Williams next contends that Mr. Edison's statement in paragraph 3 of his affidavit (which states, "[a]t no time was there any intent or purpose of the 'agency' language of the contract to entitle the Cities to directly take gas at the price set in my wholesale acquisition contract with Vesta") is contradicted by the fact that he did not mention any intent or purpose for the agency language when responding to the question whether the "agency" provision of the contract was ever amended (his response was, "No, that hasn't been amended. I think this was some language that I think Vesta wanted, wanted in there.").

However, the court cannot find that Mr. Edison's affidavit is unequivocally contrary to his prior deposition testimony because he was not asked about the purpose or intent of the "agency" language. As a result, the referred to statement in the affidavit is not a "transparent sham." Thus, the affidavit in question will not be stricken.

██ Williams also asserts that Mr. Edison's statement at paragraph 5 of his affidavit, that he purchased gas after July 22, 1988, for four of the Cities "not under the terms of my old Supply Agreement of January 29, 1987, but under a new interim agreement . . . ," is directly contrary to the following deposition testimony:

Mr. Schmidt: Okay. So in August of '88 you purchased gas from Vesta for the four cities as to which you are a seller?

Mr. Edison: Right.

Mr. Schmidt: And since this contract wasn't in effect I assume those transactions occurred under Exhibit 10 [the January 29, 1987 contract]?

Mr. Edison: That's correct.

(WNG's First Motion to Strike, Initial Brief, p. 9.)

Although this affidavit statement can be characterized as "unequivocally" contrary to prior testimony, and the prior testimony was "clear answers to unambiguous questions," the court believes, given the record in this case, that the discrepancy creates an issue of credibility which should go to the weight of the evidence and is up to the trier of fact to determine. Such a finding is supported by the fact that even if the court were to determine the affidavit statement is a "transparent sham," such a finding would be irrelevant since there is record support for the questioned affidavit statement. For instance, as this court stated in *Chanute I,* 678 F.Supp. at 1527, Mr. Tudor's testimony supports a finding that "the Cities' contracts with Vesta were ef-

fectively terminated when WNG closed its pipeline." Thus, since there is record support for the statement at issue, the court finds that such statement should not be stricken.

■ Williams' final argument, that Edison's affidavit attempts to create sham factual issues, addresses Edison's affidavit statement that "[h]ad WNG not closed its line, it was my intention to offer the same 75 [cent] savings to Cleveland to treat all four cities in a similar way." (Edison Aff. ¶ 6.) Williams argues that such statement is directly contrary to Edison's June 20, 1989 deposition testimony explaining the difference between the contract price of Cleveland and the other Cities without ever mentioning an intent to change Cleveland's contract price:

Mr. Schmidt: All right. So you would have given Auburn, in June of 1987, a contract similar to Cleveland's, but at a better price?

Mr. Edison: Right. Right. There's some differences in transport; and also Auburn was 100% contract.

Mr. Schmidt: 100% meaning what?

Mr. Edison: Total requirements contract. Where Cleveland's was a 50% contract.

(WNG's First Motion to Strike, Initial Brief, p. 9.)

The affidavit statement can fairly be said to be unequivocally contrary to the prior deposition testimony and that the deposition testimony is clear answers to unambiguous questions. If Edison intended to increase Cleveland's discount rate so that it was the same as the other Cities, then he would have surely stated such when asked if another city was to get a better price.

Furthermore, there is no record support for Edison's change of heart. As the court has previously found:

Such a gratuitous modification of the contract by Edison is very unlikely considering Cleveland had a five-year contract at the $.50 Mcf rate. Consequently, the court finds such a claim by the plaintiff is implausible—simply makes no economic sense—and since the plaintiff has not come forward with more persuasive evidence to support this claim, Williams' motion against Cleveland for

extended period damages is granted. *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 587 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986).

*Chanute II,* slip op. at 42. Thus, since the affidavit statement at issue is unequivocally contrary to Edison's prior deposition testimony and there is no other record support for such statement, the court finds such statement should be stricken.

## FINDINGS OF FACT

■ When all of the rhetoric from both sides is stripped away, it is clear that the primary issue this court must address is whether Williams' exercise of discretion in reversing its policy of interim open access (closing its pipeline to the transportation of third party gas) was anticompetitive conduct in violation of Section 2 of the Sherman Act, or whether such decision was a legitimate business decision, given the regulatory turmoil and chaotic conditions which existed in the natural gas industry at time.

A most impressive and persuasive detailed account of the relevant regulatory and economic history of the natural gas industry was set forth by Judge Mihm in *Panhandle,* 730 F.Supp. at 835–66. Furthermore, this court in *Chanute I,* 678 F.Supp. at 1519–25, and *Chanute II,* slip op. at 9–27, has also addressed some of the relevant regulatory and economic history. Thus, it is not necessary to reiterate such detail in the case at bar. However, since it may be helpful for an understanding of the present motion to set forth a summary of such findings as they apply to the parties in the case at bar, the court will do so.

The Cities are municipalities which own their own natural gas distribution system, referred to as local distribution companies (LDCs). The LDCs purchase gas at wholesale and then resell it to residential, commercial and industrial customers in their area. WNG is engaged in the interstate sale and transportation of natural gas. Its primary customers are LDCs and industrial users. *Chanute I,* 678 F.Supp. at 1519.

The current regulatory scheme of the natural gas industry has it roots in the

passage of the Natural Gas Act of 1938 (NGA), 15 U.S.C. § 717 *et seq.* The primary aim of the NGA has been to protect consumers from exploitation at the hands of natural gas companies. *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944). The NGA gave the Federal Power Commission (FPC) broad regulatory powers, including the power to set "just and reasonable" rates. *Id.* at 611–12, 64 S.Ct. at 291–92. Since Williams is a "natural gas company" and engaged in the interstate sale and transportation of natural gas, it is subject to regulation by the Federal Energy Regulatory Commission (FERC or the Commission), the FPC's successor. 15 U.S.C. § 717.

The NGA allowed the FPC to set ceiling prices on interstate sales from natural gas producers to pipelines (the wellhead price) and to regulate the price pipelines could charge their downstream customers. *Transcontinental Gas Pipe Line v. Oil & Gas Bd.*, 474 U.S. 409, 420, 106 S.Ct. 709, 715–16, 88 L.Ed.2d 732 (1986). In regulating the wellhead price, however, the FPC set the price below the market price. *Maryland People's Counsel v. F.E.R.C.*, 761 F.2d 768, 770 (D.C.Cir.1985). As a result, a large discrepancy developed between the price of unregulated intrastate gas and the price for regulated interstate gas, causing producers of natural gas to withhold production from the interstate market. *Id.*

Furthermore, caused in part by NGA's regulation of wellhead prices, a serious natural gas shortage developed in the late 1960s and continued into the 1970s. *Chanute I*, 678 F.Supp. at 1522. As a result, not all of the LDCs' natural gas delivery demands were met. *Panhandle*, 730 F.Supp. at 836.

To increase the assurance that they would receive their delivery demands, many of the contracts entered into between LDCs and the interstate pipelines contained "best effort" or "full requirements" provisions. *See Panhandle*, 730 F.Supp. at 836. For instance, prior to December of 1986, all of the Cities had "full requirements" contracts with Williams. Such contracts required the Cities to purchase all of their requirements from Williams and required Williams to maintain sufficient gas reserves to meet those requirements. *Chanute I*, 678 F.Supp. at 1519. During the natural gas shortage years, the LDCs were very happy with this arrangement because it gave them a relatively high assurance they would receive their delivery demands. *See Panhandle*, 730 F.Supp. at 836.

In addition to the need to meet their contract obligations to the LDCs, the pipelines were encouraged by the commission to develop supply reserves and enter into long-term contracts with producers. *Chanute I*, 678 F.Supp. at 1523. Furthermore, due to the oil shortage and the tightly regulated price, the contracts between the producers and the pipelines often had nonprice incentives such as provisions which guaranteed the pipeline would "take" a certain amount of a well's "deliverability." *Panhandle*, 730 F.Supp. at 836.[9] If the pipeline did not take the guaranteed amount over a certain designated amount of time, it still was obligated to pay the producer for the full amount of gas it had guaranteed to take ("take-or-pay" liability). *Id.*[10]

During this time period, Williams acquired extensive new gas reserves from Amoco Production Company. *Chanute I*, 678 F.Supp. at 1523. Most of this gas contained high NGPA incentive prices and take-or-pay provisions. *Id.;* WNG's Final Summ.Judg. Motion, Reply Brief, Tab 3.

Motivated in part by the imbalance between supply and demand created by the NGA's artificial wellhead pricing scheme and in part by a conviction that gas production at the wellhead level was sufficiently competitive to remove regulation, in 1978 Congress enacted the Natural Gas Policy

9. The court in *Panhandle*, 730 F.Supp. at 862, defines deliverability as "the ability of a well to produce gas into a pipeline under a certain set of conditions that are defined in the contract" and is "determined by actually testing flow of the wells."

10. A pipeline's take-or-pay exposure can be figured by taking the difference between the total amount of the guarantee obligation and the amount of actual purchases multiplied by the contract price. *Panhandle*, 730 F.Supp. at 861.

Act (NGPA), 15 U.S.C. § 3301 *et seq. Chanute I*, 678 F.Supp. at 1522. The NGPA substantially terminated the commission's authority to regulate the price natural gas producers could charge but continued the commission's pervasive regulatory authority over interstate pipelines. *Id.*[11]

By 1982, however, a combination of NGPA incentives for increased production, energy conservation, mild winters and lower prices of competing fuels such as petroleum caused an oversupply of natural gas. *Chanute I*, 678 F.Supp. at 1523. Nevertheless, due in substantial part to high take-or-pay terms, producers of natural gas continued to develop new supply sources of natural gas. *Id.* The result was a surplus of gas deliverability that could not be absorbed at current market prices. *Id.*

To get rid of some of their surplus gas, and as an alternative to selling their gas to the interstate pipeline gas companies, many natural gas producers sought open access or use of interstate pipelines for transportation of the surplus gas to end customers. *Id.* In addition, purchasers, such as the LDCs who had entered into long-term contracts when there was a natural gas shortage, wanted out of their contracts—they wanted to buy gas directly from the producers and have such gas transported over the pipelines in competition with the interstate pipeline owners. *Id.* Since granting open access to their pipelines would undoubtedly decrease their requirements for sales gas and thereby substantially increase their potential take-or-pay exposure, interstate pipeline owners did not want to open their pipelines up for transportation of third party gas. *Id.; Panhandle*, 730 F.Supp. at 861–62.

However, as the price of fuel oil decreased in the early 1980s, it became apparent to many interstate pipelines that their industrial customers could switch to alternate fuels if they became less expensive than natural gas. *Panhandle*, 730 F.Supp. at 848. Thus, several interstate pipelines initiated special types of marketing pro-

grams, some of which were approved by FERC. *Id.* at 848–54. The programs were either designed to give customers with the most sensitive demand (able to switch to alternative fuels the easiest) selective price cuts, or to allow such customers to receive transportation-only service without allowing customers such as LDCs, who could not easily switch (captive customers), open access. *Id.* Most of these programs were found to be anticompetitive and discriminatory, but they were allowed to continue until November 1, 1985—the time FERC was to announce its new rules for nondiscriminatory transportation services by interstate pipelines. *Id.* at 855. *See also Maryland People's Counsel v. FERC*, 761 F.2d 768 (D.C.Cir.1985) (*MPC I*); *Maryland People's Counsel v. FERC*, 761 F.2d 780 (D.C.Cir.1985) (*MPC II*); and *Maryland People's Counsel v. FERC*, 768 F.2d 450 (D.C.Cir.1985) (*MPC III*).

In October, 1985, FERC issued Order No. 436. Many interstate pipelines opposed the order because they believed it failed to deal with take-or-pay problems. *See Panhandle*, 730 F.Supp. at 855. In relevant part, Order No. 436 requires that if an interstate pipeline holds itself out as a natural gas transporter, then the pipeline's LDCs must have the opportunity to convert their existing contract demands from obligations to purchase gas to obligations to use (or pay for) transportation services. *Chanute I*, 678 F.Supp. at 1523.

Even though it may have opposed the issuance of Order No. 436, Williams attempted to comply with the order by filing with FERC in July, 1986 an Order 436 Stipulation and Agreement (S & A) which detailed Williams' plans for a permanent open-access program. *Id.* at 1524. However, since it took FERC a lot of time to process the proposed S & A, in August of 1986 Williams sought, pursuant to Section 311 of the NGPA, a temporary waiver of 18 C.F.R. § 284.10[12] and its full requirements

---

11. By deregulating the price which gas producers could charge, it was hoped that incentives for exploration and development of new supplies of natural gas would be increased. *Panhandle*, 730 F.Supp. at 836–37.

12. Required interstate pipelines to offer firm sales customers the option to convert their firm sales obligations into an equal amount of firm transportation service.

contract provisions with the Cities. *See Chanute II,* slip op. at 16–17.

On September 29, 1986, FERC granted Williams' request for a temporary waiver of 18 C.F.R. § 284.10 and gave Williams the authority to waive its full requirements provision. *Id.* at 19–25. As a result, Williams commenced interim open access on December 23, 1986. *Chanute I,* 678 F.Supp. at 1524.

After making substantial changes to Williams' proposed permanent open-access plan, including provisions which would have given Williams some take-or-pay protection, FERC, on February 20, 1987, approved Williams' S & A. *Id.;* WNG's Final Summ.Judg. Motion, Initial Brief, Tabs 1 and 2. Williams felt the alterations made to its S & A, especially the ones eliminating its proposed take-or-pay protection, were unacceptable. *Id.* As a result, it refused to agree to such alterations.

By April of 1987, many of Williams' customers had taken advantage of the interim open access and were buying cheaper natural gas from producers. *Chanute I,* 678 F.Supp. at 1520. As a result, much of Williams' system supply was converted from sales service to transportation service, dramatically increasing Williams' take-or-pay exposure. *Id.* However, until August 1, 1987, Williams had been able to negotiate for take-or-pay relief with its producers (primarily Amoco Oil Company). *Id.*[13]

Since Williams could no longer negotiate for take-or-pay relief from Amoco, and since it did not yet have a permanent open access plan which factored in take-or-pay relief, on August 1, 1987, Williams decided it must reverse its policy of interim open access. *Id.* at 1521. Even though this decision required the Cities to purchase Williams' higher priced sales gas, it has now been established by Williams that such was a reasonable business decision considering the regulatory turmoil and the potential take-or-pay exposure it was facing.

(WNG's Final Summ.Judg. Motion, Initial Brief, Tab 1, pp. 879–81; Tab 2, pp. 1220–21.)

Such a finding is also supported by the fact that Judge Mihm in *Panhandle* found the following:

> Because of the chaos in the marketplace, and the uncertainty regarding the ultimate shape of new regulations by FERC, it was not unreasonable for Panhandle not to do any more than it did regarding negotiation of a tariff substitute for the G tariff....
>
> ....
>
> In addition, Panhandle's take-or-pay exposure provided a legitimate business rationale for Panhandle's refusal to modify the G Tariff.

730 F.Supp. at 886. Furthermore, a finding that WNG's decision to reverse its interim open-access policy was a reasonable business decision given the conditions Williams was facing is even more compelling than was such a finding in *Panhandle.*

For instance, the pipeline in *Panhandle* did not allow the LDCs to receive any transportation gas during the time in question. 730 F.Supp. at 856–58. In contrast, WNG did attempt to meet the LDCs' demands by granting interim open access. Furthermore, there was evidence in *Panhandle* that the pipeline did discriminate against some of its customers by dividing its gas market into classes. *Id.* One class was the LDCs (captive customers) and the other class was industrial customers. The pipeline in *Panhandle* did not allow its captive customers to receive transportation gas but did allow some industrial customers to receive transportation-only service under certain conditions. *Panhandle,* 730 F.Supp. at 848, 888–94. There is no such evidence of discrimination in the case at bar. Moreover, the record shows that WNG at all times was not in any way discriminatory. For instance, when WNG opened its pipeline to interim open access,

---

**13.** The court notes that the Cities allege in their response brief to WNG's final summary judgment motion, p. 6, that "WNG made the choice to not obtain take-or-pay waivers from its principal supplier, Amoco Production Company ("Amoco") after July 30, 1987." The Cities cite no record support for this allegation. Furthermore, there is record support for the contrary assertion—that WNG pursued take-or-pay relief but that Amoco was not willing to give such relief after July 30, 1987. (WNG's Final Summ. Judg. Motion, Reply Brief, Tab 3.)

it opened the line for all users. Likewise, when WNG ended its policy of interim open access, it treated all users the same.

■ The Cities' primary argument in opposition to a finding that WNG's decision to reverse its policy of interim open access was reasonable given the circumstances of this case is that there is factual support for a finding that WNG intentionally refused to transport gas for the Cities in an effort to force the Cities into purchasing all of their gas from Williams at WNG's higher sales prices and also to force the Cities into entering new contracts requiring the Cities over the next five years to purchase a substantial amount of their gas supplies from WNG at its higher sales prices. (WNG's Final Summ.Judg. Motion, Cities' Response Brief, pp. 2–3.) However, the only record support cited is the conclusory opinions of some experts. Such is not sufficient to withstand the properly supported summary judgment motion of Williams. *E.g., Mid–State Fertilizer,* 877 F.2d at 1339; and *Dart Industries, Inc.,* 704 F.2d at 498.

The Cities also argue such was not a reasonable business decision because Williams was not facing significant exposure to take-or-pay liability at the time it ended its interim open access. (WNG's Final Summ.Judg. Motion, Cities' Response Brief, pp. 6–7.) Such an argument is simply without merit. As the *Panhandle* court said:

> The Plaintiff's position, that take-or-pay was not a problem, simply lacks credibility. It is an argument easily made because, in making it, it naturally follows from Plaintiff's point of view that there would have been no significant adverse consequences for Panhandle if it had surrendered to demands to let G tariff LDC's transport non-Panhandle gas. Such is not the case. This situation was not, and is not, a Panhandle/CILCO problem, unique to their tariff and service contract relationship. It was and is an industry-wide problem,

not best dealt with by an application of the antitrust laws as if we were dealing with a free market situation.

730 F.Supp. at 917.

Moreover, the Cities' argument misses the point. It is the *potential seriousness* of the take-or-pay exposure which provides Williams with a legitimate business rationale for reversing its policy of interim open access. *Panhandle,* 730 F.Supp. at 888.

The Cities do not dispute a projection as of July, 1987 by a Williams employee that WNG's potential take-or-pay liability would have increased by at least $7.2 to 13.5 million if interim open access was continued for the next three months—through October, 1987. (WNG's Final Summ.Judg. Motion, Cities' Response Brief, p. 7.) In addition, attached to an affidavit of one of the Cities' experts is a report by the American Gas Association assessing the take-or-pay liability of the major interstate pipelines as of March 31, 1987. In regard to WNG's take-or-pay liability, the report states at Table 1 the following:

> Unresolved claims for gas purchase deficiencies aggregating approximately $50 million have been received. Other claims may be forthcoming for prior years as well as for contract years ending in 1987. Amounts which may be claimed by producers in excess of the amounts paid through March 31, 1987 could exceed $100 million.

(WNG's Final Summ.Judg. Motion, Cities' Response Brief, Tab 4.) [14]

Thus, if the court were to accept the Cities' argument, it would have to find that a business decision intended to mitigate a problem which had already created a potential $100 million liability, and which was projected to create at least a $7.2 to 13.5 million liability over the next three months, was an unjustifiable overreaction, and that no serious need for action existed. That, the court, as a matter of law, cannot do. The court finds the Cities' argument is

---

**14.** The court notes that there is much record support for a finding that WNG's *potential* take-or-pay liability was actually much greater. For instance, WNG brought to the attention of the court at oral arguments on the current motions that in a case now pending in the Superior Court of the State of Delaware, New Castle County, Amoco Production Company has asserted a counterclaim for take-or-pay damages in the amount of $203 million against WNG.

simply implausible (makes no economic sense), and since the Cities have not come forward with more persuasive evidence to support this claim, it cannot prevent Williams' summary judgment motion. *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Furthermore, it cannot be disputed that Williams made its decision to end its program of interim open access in the midst of unparalleled regulatory uncertainty and turmoil. For instance, as the court has already indicated, FERC's allowance of special marketing programs designed to allow interstate pipelines to transport cheaper gas to customers most able to switch to alternative fuels was reversed by *MPC I, MPC II,* and *MPC III.* Furthermore, in *Associated Gas Distributors v. FERC,* 824 F.2d 981, 1023–30 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988) (*AGD*) the court affirmed in substantial part Order No. 436, but remanded significant portions of the order for failure to adequately deal with take-or-pay concerns. In response to such direction by the court, FERC issued on August 7, 1987 (just a few days after WNG suspended its interim open-access program) Order No. 500 in an attempt to address some of the take-or-pay concerns on an interim basis. However, even this interim order was remanded to FERC for, among other reasons, failure to adequately explain its reasoning, failure to adequately deal with the take-or-pay problem, and failure to comply with the mandate of *AGD. American Gas Ass'n v. FERC,* 888 F.2d 136 (D.C.Cir.1989). *See also Associated Gas Distributors v. FERC,* 893 F.2d 349 (D.C. Cir.1989) (striking down one of FERC's take-or-pay allocation methods and the promulgation of FERC Order No. 500–H).[15]

It must also be noted that on June 6, 1986 FERC issued Order No. 451. How Order No. 451 works and its application to this case has already been addressed by this court and that ruling is herein adopted. *Chanute I,* 678 F.Supp. at 1524–25; and *Chanute II,* slip op. at 38–41. Reference to Order No. 451 at this point, however, is merely made to note that the Fifth Circuit has recently held that FERC exceeded its congressional authority by issuing Order Nos. 451 and 451–A. *Mobil Oil v. FERC,* 885 F.2d 209 (5th Cir.1989), *stay granted,* —— U.S. ——, 110 S.Ct. 830, 107 L.Ed.2d 826 (1990), *cert. granted,* —— U.S. ——, 110 S.Ct 2585, 110 L.Ed.2d 266 (1990). Thus, such orders were vacated but are currently still in effect pending decision on a petition for certiorari to the Supreme Court filed on March 15, 1990. It should also be noted that one of the reasons cited by the Fifth Circuit for vacating Order No. 451 was that "the prospect for exacerbating the take or pay problem runs rampant throughout the provisions of Order No. 451." *Id.* at 224.[16]

---

**15.** Order No. 500–H was not issued as a "final" order until December 13, 1989, and Order No. 500–I was issued on February 12, 1990. Those orders are still on appeal and thus, may be further modified.

**16.** The regulatory uncertainty and turmoil WNG was facing is also shown by *Martin Exploration Mgt. Co. v. FERC,* 813 F.2d 1059 (10th Cir.1987), *rev'd,* 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988). In that case the Tenth Circuit rejected a FERC ruling interpreting NGPA §§ 121 and 101(b)(5) to mean that any gas that qualified for both deregulated and regulated treatment would be treated as deregulated, and also rejected the commission's ruling that certain "new tight formation gas" was subject to regulation under NGPA § 107(c)(5) and thus automatically qualified for deregulation as new gas under NGPA §§ 102 or 103. The Tenth Circuit based its rejection of FERC's position primarily on a finding that NGPA § 101(b)(5) unambig-

uously required that the applicable category (deregulated versus regulated) be that which, at any particular moment, resulted in the gas producer receiving the highest contract price for its gas. 813 F.2d at 1069. However, in reversing the Tenth Circuit's findings, the Supreme court found ample support for FERC's findings. *FERC v. Martin Exploration Mgt. Co.,* 486 U.S. 204, 108 S.Ct. 1765, 100 L.Ed.2d 238 (1988).

Regulatory uncertainty is also shown by the fact that the court in *Williams Natural Gas Co. v. FERC,* 872 F.2d 438 (D.C.Cir.1989) held that FERC had failed to provide adequate reasoning or explanation for its termination of ongoing rule-making proceedings concerning the elimination of the tight sands gas incentive price under NGPA § 107(c)(5), and thus remanded the case to FERC for such consideration. FERC did subsequently eliminate the incentive price. Limitation on Incentive Prices for High-Cost Gas to Commodity Values, 55 Fed.Reg. 6367 (Feb. 23, 1990).

Throughout this regulatory turmoil, FERC has consistently been chided for either its indifference to or its inadequacy in addressing the take-or-pay problem. *E.g., Consolidated Edison Co. of New York, Inc. v. FERC*, 823 F.2d 630, 641–42 (D.C. Cir.1987). Thus, it is clear that due to the regulatory uncertainty and turmoil the take-or-pay problem is not, and never was, only a problem between the Cities and Williams. "It was and is an industry-wide problem, not best dealt with by an application of the antitrust laws as if we were dealing with a free market situation." *Panhandle*, 730 F.Supp. at 917.

Furthermore, it must also be noted that the Cities have not presented any evidence which could be construed as indicating Williams had the specific intent to monopolize or further its monopoly power. Moreover, the evidence overwhelmingly compels the contrary conclusion.

For instance, in addition to the already mentioned evidence which shows Williams' conduct was motivated by reasonable business decision justifications, the record, after extensive discovery conducted by both parties, now indicates that Williams was diligent in pursuing a solution which would allow for permanent open access while affording it some take-or-pay protection. Soon after Williams refused to agree to the changes made to its original S & A in FERC's February 20, 1987 approval of such S & A, Williams began preparations to submit a Revised Stipulation and Agreement (RS & A).

On January 4, 1988, Williams submitted its RS & A to FERC for approval. FERC approved the RS & A by a final order issued on July 5, 1988, 43 F.E.R.C. (CCH) ¶ 61,227 (1988), and WNG's revised tariff was accepted on July 19, 1988, 44 F.E.R.C. (CCH) ¶ 61,145 (1988). Williams accepted the NGA § 7 certificate on July 20, 1988, thus enabling it to begin providing permanent nondiscriminatory open-access transportation services.[17]

## CONCLUSIONS OF LAW

It is a well settled rule that in order to establish the offense of monopolization in violation of Section 2 of the Sherman Act the following two elements must be shown:

> (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *see also Bright v. Moss Ambulance Service*, 824 F.2d 819, 823 (10th Cir.1987); and *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1519 (10th Cir.1984), *aff'd*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

The first step in evaluating an alleged monopolization claim is to define the relevant markets. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979). This step is further broken down into a determination of the relevant product market and the relevant geographic market. *Brown Shoe Co. v. United*

---

**17.** The court notes that throughout these summary judgment motions the parties have disputed whether it was the July 22, 1988 stipulation before the Tenth Circuit or FERC's granting and Williams' acceptance of an NGA § 7 certificate which provided the Cities with open access to Williams' pipeline. This issue is irrelevant to any issue now before the court and is not properly before the court for purposes of the summary judgment motion.

The court does note, however, that contrary to Williams' assertion, the court has not ruled on this matter. At the January 18, 1989 status conference referred to by Williams (Reply Brief, pp. 4–5 and Tab 4), all the court did was acknowledge that Williams does now have in place an NGA § 7 permanent open-access certif-

icate. This is not in any way contrary to this court's and FERC's earlier position that Williams had the authority under NGPA § 311, during the period it closed its pipeline to interim open access, to reverse that policy and once again provide interim open access transportation. *See Chanute II*, slip op. at 24–25; and *Williams Natural Gas Company*, Docket No CP88–229–000, 42 F.E.R.C. ¶ 61,189, pp. 61,667–8 (Feb. 19, 1988). However, the court also notes that what the Cities were really wanting was permanent open access which could only be provided by the issuance of an NGA § 7 certificate since such would require the abandonment of services. In any event the resolution of this issue is not properly before the court.

*States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). In *Chanute I*, this court found the relevant product market to be natural gas and the relevant geographic market to be the area encompassing the plaintiff Cities. 678 F.Supp. at 1532.

The court's definition of the relevant geographic market is not questioned by either party for purposes of these summary judgment motions and will thus be adopted herein. However, the Cities argue that the relevant product market ought to be narrowed from the court's earlier findings to include only "transportation of firm requirements gas at reasonable rates under long-term contracts, upon which the Cities could rely for firm service for their distribution systems" (hereinafter, "firm requirements transportation gas"). (WNG's Final Summ.Judg. Motion, Cities' Response Brief, p. 3.)

The Supreme Court has said that the primary consideration in determining the relevant market is to find those commodities which are "reasonably interchangeable by consumers for the same purposes— price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). The Tenth Circuit has interpreted this rule as requiring the court to look "to the ready availability of substitutable products." *Bd. of Reg. of U. of Okl. v. NCAA*, 707 F.2d 1147, 1158 (10th Cir.1983), *aff'd*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Furthermore, the Tenth Circuit has also held that as a matter of law the trial court must not exclude from the relevant product market definition products which vigorously compete with the product defined by trial court— have a cross-elasticity of demand which is likely to be extremely elastic. *Westman Com'n Co. v. Hobart Intern., Inc.*, 796 F.2d 1216, 1221 (10th Cir.1986); *see also, Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 919 (10th Cir. 1975), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) (held the trial court's narrow definition of the relevant product market was plain error in light of the evidence of cross-elasticity and interchangeable quality of the products).

Based on these directives, the court must find the Cities' asserted definition of the relevant product market is incorrect as a matter of law. The first reason the court must reject the Cities' definition of the relevant product market is because it focuses on what the Cities wanted, not what was "reasonably interchangeable by *consumers* for the same purposes." *E.I. du Pont de Nemours & Co.*, 351 U.S. at 395, 76 S.Ct. at 1007 (emphasis added). Since the Cities are essentially a "purchasing agent on behalf of the ultimate end-user customer," the demand characteristics of the ultimate end-use consumer must be considered in the determination of the relevant market. *Panhandle*, 730 F.Supp. at 866.

Secondly, the Cities have not presented any evidence that consumers could not or would not use Order 451 gas or gas other than firm requirements transportation gas if such gas was available at relatively less expensive rates. Furthermore, the record of this case would indicate the contrary conclusion is compelled. As the court has more specifically set forth in its findings of fact, this lawsuit arose out of the fact that, because of unforeseeable regulatory and economic factors, the wellhead price of natural gas became relatively less expensive than WNG sales gas and consumers wanted access to that relatively cheaper gas. Thus, the Cities' argument that the relevant market is limited to one narrow segment of the natural gas market is directly contrary to the very reason this lawsuit came into being in the first place.

Finally, the Cities' narrow definition of the relevant product market simply does not make any sense. Contracts for the sale of the same commodity often vary with respect to price, volume, and term. However, that does not mean that a separate market is established for each contract of the same commodity merely because that contract has different terms. Thus, since neither party has presented sufficient evidence for the court to question its earlier findings in regard to the relevant product market, the court will reaffirm its earlier finding that the relevant product market

is natural gas. *Chanute I,* 678 F.Supp. at 1532.[18]

Monopoly power is defined in this circuit as requiring "proof of *both* power to control prices and power to exclude competition." *Reazin v. Blue Cross and Blue Shield of Kansas,* 899 F.2d 951, 967 (10th Cir.1990) (emphasis original). Since Williams does not dispute for purposes of this summary judgment motion that it has monopoly power, the court will herein assume Williams does have such power. (WNG Final Summ.Judg. Motion, Reply Brief, p. 8, n. 6.)

### A. Intent to Monopolize Claim

The mere existence of monopoly power, however, does not establish a violation of the Sherman Act. Rather, "[t]he offense of monopolization under Section 2 of the Sherman Act requires proof of monopoly power ... plus conduct designed to maintain or enhance that power improperly." *Olympia Equip. Leasing v. Western Union Telegraph,* 797 F.2d 370, 373 (7th Cir. 1986) (citing *Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1703–04, and *Aspen,* 472 U.S. at 596, n. 19, 105 S.Ct. at 2854, n. 19).

■ Moreover, in determining whether the second *Grinnell* requirement is satisfied,[19] at a minimum a general intent to monopolize is necessary to establish a Section 2 Sherman Act claim. *Aspen,* 472 U.S. at 602, 105 S.Ct. at 2857. It has been said in the context of a non-regulated business that if a dominant firm's conduct leads to "the acquisition or maintenance of monopoly power," then the requisite willful monopolistic intent is presumed. *MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1108 (7th Cir.1983).

However, in the case of a regulated utility, that same case gives the following guidance:

> "In the particular circumstances of a regulated utility ... entitled to recover its cost of services and provide its investors with a reasonable rate of return, we believe that something more than general intent should be required to establish a Sherman Act violation." *See also* Watson & Brunner, [*Monopolization by Regulated "Monopolies": The Search for Substantive Standards,* 22 Antitrust Bull. 559], at 574–79 [ (1977) ] (willfulness by a regulated monopoly should be demonstrable only by evidence of predatory conduct or other exclusionary acts contrary to public policy). We reaffirm our holding in *Mishawaka* and, therefore, reject MCI's contention ... that the trial court erred in requiring MCI to prove that each allegedly anticompetitive act or practice attributed to AT & T was done with the intent to maintain a monopoly in the relevant market.

*MCI Communications,* 708 F.2d at 1108 (quoting *Mishawaka v. American Electric Power Co.,* 616 F.2d 976, 985 (7th Cir.1980). The *Panhandle* court interpreted this to require that a regulated utility, such as an interstate pipeline, must be shown to have a " 'specific intent to monopolize,' namely, an intent to actually control prices or exclude competition, i.e., to seize or hold monopoly power." 730 F.Supp. at 910.

■ Moreover, some recent cases have emphasized, by finding as a matter of law, that even relatively clear proof of monopolistic intent, such as "the desire to crush a competitor, standing alone," does not violate Section 2 of the Sherman Act if a valid business justification for the conduct in question is offered and is not sufficiently refuted. *Ocean State Physicians Health Plan, Inc. v. Blue Cross,* 883 F.2d 1101, 1113 (1st Cir.1989).[20] *See also Reazin v.*

---

**18.** The court notes that there is some support for a more broadly defined product market. In *Panhandle,* 730 F.Supp. at 900, the court recognized that industrial end users could easily switch to alternative fuels if natural gas prices were uncompetitive. In addition, since one of the Cities' experts alleges that "[r]esidential consumers shift to electric space heating," the relevant product market probably ought to include the consumer's ability to conserve natural gas (*Panhandle,* 730 F.Supp. at 868–69) or switch to electric heat within the relevant product market. However, since WNG failed to argue for a

broader product market definition, the court will apply the product market used in *Chanute I.*

**19.** That is, "the willful acquisition or maintenance of that [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1704.

**20.** What is a sufficient business justification is an appropriate matter to consider at the sum-

*Blue Cross & Blue Shield of Kansas, Inc.,* 663 F.Supp. 1360, 1486–87 (D.Kan.1987), *aff'd,* 899 F.2d 951 (10th Cir.1990) (this court granted summary judgment on counterclaims under §§ 1 and 2 of the Sherman Act, in part, because evidence of legitimate business reasons for the counterclaim defendant's conduct was not sufficiently refuted).

■■■ Furthermore, a monopolist is not required to enter into business transactions without considering how such transactions might affect the monopolist's business. For instance, the Supreme Court in *Aspen* approved the following instruction given by the district court in that case:

"[A] company which possesses monopoly power and which refuses to enter into a joint operating agreement with a competitor or otherwise refuses to deal with a competitor in some manner does not violate Section 2 if valid business reasons exist for that refusal.

"In other words, if there were legitimate business reasons for the refusal, then the defendant, even if he is found to possess monopoly power in a relevant market, has not violated the law."

472 U.S. at 597, 105 S.Ct. at 2854 (quoting from court's instructions). In *Aspen,* the court found that a jury could have reasonably found that the defendant "elected to forgo [sic] ... short-run benefits because it was more interested in reducing competition ... over the long run by harming its smaller competitor." 472 U.S. at 608, 105 S.Ct. at 2860.

This principle was stated by the *Panhandle* court as follows:

Just as other firms generally may refuse to deal with another party without violating antitrust laws, *Becker v. Egypt News Co.,* 713 F.2d 363, 366 (8th Cir. 1983), a firm having an otherwise lawful monopoly has no duty to deal with a competitor, reduce prices or help new entrants in the market. *Olympia Equipment Leasing,* 797 F.2d at 376. Antitrust liability lies only if business reasons are merely a pretext for anticompetitive behavior; no liability attaches where the firm has valid business reasons for its activities. *Becker,* 713 F.2d at 370.

730 F.Supp. at 908. *See also United States Steel Corp. v. Fortner Enterprises,* 429 U.S. 610, 612, n. 1, 97 S.Ct. 861, 863, n. 1, 51 L.Ed.2d 80 (1977) ("normal business goals, not forbidden by § 2 without other evidence of intent to monopolize"); and *Southern Pacific Communications v. AT & T,* 740 F.2d 980, 1009–10 (D.C.Cir.1984) (a denial of access to an essential facility may not violate the antitrust laws if the alleged anticompetitive conduct was reasonable and done in good faith pursuant to regulatory obligations).

Thus, to establish in the case at bar whether or not Williams' decision to reverse its policy of interim open access violated Section 2 of the Sherman Act, the court must address two questions: (1) whether Williams has established there was a valid business reason for such decision, and (2) whether such asserted business reason was merely a pretext for anticompetitive behavior.

As the court sets forth more fully in its findings of fact, given the uncertainty and chaotic conditions in the natural gas industry at the time and the potential take-or-pay liability it was facing, Williams has certainly established a legitimate business reason for its decision to close its pipeline to interim open access.

In addition, it is not disputed that Williams had exposure for up to $100 mil-

mary judgment stage. *See Bell v. Dow Chemical Co.,* 847 F.2d 1179, 1185 (5th Cir.1988) (although the court ultimately found there was a triable issue of fact in the Sherman Act Section 2 case before it, the court noted: "Defendants can offer business justifications for the refusal to deal. If the justifications are supported by legitimate business concerns ... then the district court may decide as a matter of law that the defendant's refusal ' "was actuated by innocent motives rather than by an intention and

desire to perpetuate a monopoly" ' "); and *Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1326 (6th Cir.1983) (in affirming the district court's granting of summary judgment in favor of the defendant in a suit based on both Sherman Act and Clayton Act claims, the court said that since the record evidence showed that the defendant's refusal to extend credit to the plaintiff was based upon valid business considerations, no Clayton Act violation could be found).

lion in past take-or-pay obligations and was facing at least $7.2 to $13.5 million of take-or-pay exposure over the next few months. Failure to take measures to check that type of exposure could certainly affect a pipeline's ability to provide reliable services to its customers. Furthermore, it is not disputed that Williams incurred the take-or-pay liability in order to insure that LDCs such as the Cities would receive their delivery demands. Thus, both the initial acquisition of take-or-pay obligations and the final response to the potential take-or-pay exposure have now been shown to be reasonable actions taken by Williams to insure reliable service to its customers. *See California Computer Products, Inc. v. IBM,* 613 F.2d 727, 736 (9th Cir.1979) (holding that a verdict must be directed in favor of defendant when plaintiff's evidence is insufficient to establish the defendant acted unreasonably); and Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards,* 22 Antitrust Bull. 559, 579 (asserts that reasonable actions legitimately taken by a regulated utility to protect its ability to provide reliable service to its customers should not be deemed evidence of willful monopolization).

Moreover, the Cities have not offered sufficient evidence to refute Williams' legitimate business objectives. The only evidence the Cities offer in support of their assertion that such business objectives were mere pretext for an anticompetitive motive are the conclusory affidavits of their experts. In such affidavits the experts conclude that Williams closed its pipeline in order to force the Cities into accepting Williams' high priced sales gas and to force the Cities into new five-year contracts with unfavorable terms. However, those experts do not cite any specific factual support for such opinions and do not set forth "a process of reasoning beginning from a firm foundation." *Mid–State Fertilizer,* 877 F.2d at 1339. Thus, such affidavits are insufficient to create a genuine issue of material fact in this case. *See Key Financial Planning Corp. v. ITT Life Ins. Corp.,* 828 F.2d 635, 638 (10th Cir.1987); and *Bright v. Moss Ambulance Service, Inc.,* 824 F.2d 819, 824, n. 6 (10th Cir.1987).

In addition, the Cities' arguments are simply implausible given what the record as a whole now reveals. It simply does not make sense that Williams would close its pipeline in order to force the Cities into entering into new five-year contracts, because the record indicates that Williams, shortly after closing the pipeline to interim open access, started revising its S & A and did in fact present its RS & A to FERC for approval on January 4, 1988. (WNG's Final Summ.Judg. Motion, Initial Brief, Tab 3.) Furthermore, it cannot be disputed that Williams' RS & A would have allowed permanent open access for the Cities. *Id.*

Thus, if Williams had intended to force the Cities into accepting its more expensive sales gas for the next five years, it surely would not have embarked, shortly after closing its pipeline to interim open access, on an effort to get the RS & A implemented, because as soon as such was in effect Williams would have been required to provide permanent open access. (WNG's Final Summ.Judg. Motion, Initial Brief, Tab 3.) Furthermore, FERC's temporary waiver of 18 C.F.R. § 284.10 would have ended after Williams became a permanent open-access provider. *Northwest Central Pipeline Corp.,* Docket No. RP86–155–000, 36 F.E. R.C. ¶ 61,371, p. 61,907 (Sept. 26, 1986). Therefore, any LDC with a firm sales contract would have had the right to convert its sales obligation into a proportional firm transportation obligation. 18 C.F.R. § 284.10.

In sum, this court's finding that Williams has established that it was motivated by legitimate business concerns in its decision to reverse its policy of interim open access, and that the Cities have not offered any evidence which could be construed as showing the asserted business motivation was merely a pretext for an anticompetitive motive, is dispositive of the Cities' general monopolization claim. In other words, since Williams has offered an unrefuted legitimate business justification for its conduct, the Cities cannot show an essential element for an Sherman Act Section 2 claim—"the willful acquisition or maintenance" of monopoly power. *Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1704. Thus,

Williams is entitled to summary judgment on the intent to monopolize claim. *See McKenzie v. Mercy Hospital*, 854 F.2d 365, 370 (10th Cir.1988).

**B. Essential Facility Claim**

■ As the Tenth Circuit acknowledged in *Aspen*, if a business controls a scarce resource then it has a duty or obligation to allow even competitors *reasonable* access to the facility. 738 F.2d at 1519. The necessary elements of this doctrine include: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *MCI Communications Corp.*, 708 F.2d at 1132–33. The only two elements at issue for purposes of this summary judgment motion are the second and third ones.

The outer parameter of this doctrine has been illuminated by a recent Second Circuit case affirming the district court's award of summary judgment. *Twin Laboratories v. Weider Health & Fitness*, 900 F.2d 566 (2d Cir.1990). That case ruled that, "[a]s the word 'essential' indicates, a plaintiff must show more than inconvenience, or even some economic loss; he must show that an alternative to the facility is not feasible." *Id.* at 570. This the Cities cannot do.

As is evident from this court's findings in *Chanute II*, slip op. at 38–41, Order No. 451 gas was a feasible alternative that the Cities made a conscious decision not to pursue. Furthermore, in light of the regulatory and economic history that has become evident through discovery in this case, it is now clear that Williams' sales gas price was reasonable.

As the court has already established, the Cities have not presented any competent evidence showing that WNG sales gas was priced higher because of some predatory motive. In fact, the record establishes that WNG sales gas was priced higher because of the nonprice incentives incurred by WNG in an effort to assure an adequate supply for its firm requirement customers—such as the Cities. Thus, since WNG's sales gas price was reasonable given the regulatory and economic history in the natural gas industry, WNG sales gas has also now been established as a feasible alternative to third party transportation gas.

Therefore, since the Cities had reasonable alternatives, it is clear the Cities cannot prove they were denied access to an essential facility. As a result, Williams is entitled to summary judgment on the essential facility claim. *McKenzie*, 854 F.2d at 370.

**C. Monopoly Leveraging**

■ The first question the court must address here is whether this circuit would recognize monopoly leveraging as a separate offense under Section 2 of the Sherman Act or whether it is merely one way of proving unlawful monopolization.

To establish this cause of action the Cities rely primarily on *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979). However, in a very recent case the Second Circuit, after noting that *Berkey Photo*, 603 F.2d at 284, stated "it is improper, in the absence of a valid business policy, for a firm with monopoly power in one market to gain a competitive advantage in another by refusing to sell a rival the monopolized goods or services he needs to compete effectively in the second market," said such was dictum and that such case involved a "tying" claim. *Twin Laboratories*, 900 F.2d at 570.

Thus, this court believes that this circuit would not recognize monopoly leveraging as a separate offense under Section 2 of the Sherman Act.[21] Since it has been es-

21. *But see Panhandle*, 730 F.Supp. at 922–26. Although the *Panhandle* court predicted the Second Circuit would recognize monopoly leveraging as a separate offense under Section 2 of the Sherman Act, it said one of the necessary elements for such a claim was that the conduct be "done with the specific intent to gain an unwarranted competitive advantage in the second market." 730 F.Supp. at 925. The Cities could not prove this element on the record before the court because, as the court sets forth *infra* under the commentary on attempted monopolization, the Cities have not presented any evidence which could be construed as showing the necessary specific intent.

tablished herein that Williams was motivated by legitimate business concerns in its decision to reverse its policy of interim open access and that the Cities have not offered sufficient evidence which could be construed as showing the asserted business motivations were merely a pretext for an anticompetitive intent, the Cities cannot show the willful maintenance of monopoly power—a necessary element of a Sherman Act § 2 claim. Therefore, since the Cities cannot establish a general monopolization claim, the Cities' monopoly leveraging claim also cannot be established.

### D. Attempted Monopolization

In this circuit, the following four elements must be established to prove the offense of attempted monopolization:

> (1) relevant market, (2) dangerous probability of success in monopolizing the relevant market, (3) specific intent to monopolize, and (4) conduct in furtherance of the attempt.

*Bright v. Moss Ambulance Service, Inc.,* 824 F.2d 819, 823 (10th Cir.1987).

■ As the court points out in its findings of fact, the Cities have not presented any evidence in this case which could be construed as indicating Williams had the specific intent to monopolize. For instance, the only evidence presented by the Cities which could even arguably support such a finding is the fact WNG reversed its policy of interim open access and the conclusory opinions of some experts. However, as has been previously noted, because of the regulatory turmoil, economic uncertainty, and the take-or-pay exposure WNG was facing at the time, the decision to close its pipeline to interim open access cannot evidence an intent to monopolize. Furthermore, the Cities' experts, who state that it is their opinion that Williams closed its pipeline to force the Cities to agree to enter into five-year sales contracts, cite no record support for such opinion and do not set forth "a process of reasoning beginning from a firm foundation." *Mid–State Fertilizer,* 877 F.2d at 1339.

Moreover, the record in this case establishes that Williams was diligent in pursuing a solution which would allow for permanent open access while affording it some take-or-pay protection. Thus, since the Cities have not come forward with any evidence which could show Williams possessed the necessary intent, Williams' summary judgment motion against the Cities' attempted monopolization claim is granted. *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 277, 289, 88 S.Ct. 1575, 1586–87, 1592–93, 20 L.Ed.2d 569 (1968); and *Craig v. Sun Oil Co.,* 515 F.2d 221, 225 (10th Cir.1975).

### E. Transitory Effect of Williams' Conduct

■ The above findings are also supported by the fact that Williams' conduct was necessarily transitory in nature.

It is not disputed that at the time of the asserted anticompetitive conduct by Williams, FERC had imposed a regulation which required interstate pipelines to allow firm sales customers such as the Cities to convert their sales obligations to transportation obligations. 18 C.F.R. § 284.10. Furthermore, as this court recognized in *Chanute II,* slip op. at 19–23, Williams only received a limited waiver of such provision for an interim period. Thus, Williams clearly did not have unfettered authority to continue with a closed system.

Moreover, as the court set forth more fully in its finding of facts, the record indicates that after receiving such limited waiver Williams did in fact diligently seek the issuance of a permanent open-access certificate. Therefore, this is the type of case where the triple damage sanction of the Clayton Act is too harsh a remedy because the asserted unfair methods of competition only threaten to have a transitory impact on the marketplace. *Colorado Interstate Gas v. Natural Gas Pipeline,* 885 F.2d 683, 697 (10th Cir.1989). *See also Reazin,* 899 F.2d at 968 ("market power, to be meaningful for antitrust purposes, must be durable").

Therefore, based on the above findings of fact and conclusions of law the court finds that Williams' motion for summary judgment on all of the Cities' remaining antitrust claims should be granted.

IT IS ACCORDINGLY ORDERED this 27th day of July, 1990, as more fully set forth herein, that Williams' motion to strike some of the Cities' affidavits (Dkt. No. 259) is denied in part and granted in part.

IT IS FURTHER ORDERED that Williams' motion for summary judgment (Dkt. No. 252) on all of the Cities' remaining Sherman Act Section 2 claims is granted.